# Illinois Official Reports

## Appellate Court

---

**People v. Lawson, 2015 IL App (1st) 120751**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES LAWSON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-0751 |
| Filed | March 6, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-20688; the Hon. James L. Rhodes, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; mittimus corrected. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Rebecca I. Levy, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Peter Fischer, and Whitney Bond, Assistant State's Attorneys, of counsel), for the People. |

JUSTICE LAMPKIN delivered the judgment of the court with opinion.
Justices Hall and Rochford concurred in the judgment and opinion.


**OPINION**

¶ 1        After a jury trial, defendant Charles Lawson was found guilty of four counts of home invasion and four counts of aggravated kidnapping. The trial court sentenced him to natural life in prison.

¶ 2        On appeal, defendant contends that (1) the trial court should have granted his motion to quash his arrest and suppress evidence because the police stopped him without reasonable suspicion where he was walking on a public street near the site of the home invasion but 3½ hours after it had occurred; (2) the trial court should have granted his motion to suppress the lineup identifications, which were unduly suggestive based on defendant's attire; (3) the statutory provision regarding the sentencing of habitual criminals is unconstitutional as applied to defendant because one of his prior qualifying convictions–a 1998 armed robbery–occurred when he was 17 years old and, thus, his current natural life sentence constitutes punishment too severe for conduct that he had committed as a juvenile; (4) his natural life sentence based on being adjudicated an habitual criminal should be vacated because it is predicated on a 2003 armed robbery conviction that is void; and (5) his multiple convictions for home invasion violate the one-act, one-crime rule.

¶ 3        For the reasons that follow, we vacate three of defendant's four home invasion convictions pursuant to the one-act, one-crime rule but otherwise affirm the judgment of the circuit court.


¶ 4                                    I. BACKGROUND

¶ 5        Defendant Charles Lawson and codefendants Jason Thomas and Darnell Hicks were arrested and indicted for various offenses stemming from the August 15, 2006 home invasion and aggravated kidnapping of members of the Sayegh family. Prior to trial, defendant Lawson moved the court to quash his warrantless arrest and suppress the evidence against him, and to suppress the lineup identifications of him.

¶ 6        At the hearing on the motion to quash, the evidence established that the police were called to the Sayegh home on 15451 David Lane in Oak Forest around 12:30 a.m. for a home invasion in progress with offenders armed with guns. Police officers Steven Lipinski and Bill Shemanske and Sergeant Scott Durano were among the numerous police officers who responded to the call. The area was entirely residential. Officers Lipinski and Shemanske walked up the driveway and saw codefendant Hicks exit the back door of the house. Officer Shemanske chased Hicks and lost sight of him, but then found him a few minutes later inside a car parked on a nearby corner. Meanwhile, Officer Lipinski saw two black males run out the front door of the house. Officer Lipinski described one male, later identified as codefendant Thomas, as heavyset and wearing a sports jersey. Officer Lipinski described the other male, later identified as defendant Lawson, as thin and dressed all in black. Sergeant Durano was a K-9 handler. Shortly after Officer Shemanske had detained Hicks, Sergeant Durano's dog

alerted to Thomas, who was hiding under a car parked a few houses down from the Sayeghs' home. Thomas was wearing a green and white sports jersey. Officer Lipinski spoke to the Sayegh family and received their description of defendant, who was still at large.

¶ 7 The police continued to search the area, looking in the backyards, gangways, bushes and cars. Aside from police officers, no one was walking around in that area. At 3 a.m., the police were advised to "loosen up" the area, meaning that the search area would expand and become less concentrated with police officers to induce the missing third offender to come out of hiding so the police could apprehend him. At 3:55 a.m., Sergeant Durano drove past defendant Lawson, who was standing on the corner of 155th and Central, which was less than one block from the Oak Forest police station. This location was about three blocks from the Sayegh house. Defendant was wearing blue jeans and a dark blue or black shirt with blue and white skull graphics on it. He was the first person that Sergeant Durano and the other police officers had seen on the street since the police had loosened up the search. Sergeant Durano thought defendant might match the description of the missing third offender, so he turned into the police station parking lot and radioed Officer Shemanske for Officer Lipinski's description of the third offender. Officer Shemanske replied that the description was of a short, black male wearing dark clothing. According to the police report eventually written by Officer Lipinski, he had described defendant as a black male, late twenties, wearing black clothing. Sergeant Durano advised Officer Shemanske that defendant might match the description, and Sergeant Durano and Officer Shemanske separately drove toward defendant, who had crossed the street and was walking toward a residential neighborhood.

¶ 8 Sergeant Durano and Officer Shemanske caught up to defendant, stopped him and exited their cars. They were both in uniform and confronted defendant in front of Sergeant Durano's squad car. Sergeant Durano was positioned in front of defendant and Officer Shemanske was positioned somewhat behind defendant in case he took off running. Sergeant Durano asked defendant where he was coming from, and defendant replied that he was at a friend's house trying to sell him dope. Sergeant Durano asked the friend's name and where his house was located, but defendant could not remember the location of the house or give his friend's name. Defendant's inability to tell the police the particular location from which he claimed to have come heightened Sergeant Durano's suspicions. Sergeant Durano knew that the suspects had possessed guns during the home invasion and the police had not recovered any weapons yet, so he was concerned that defendant might be armed and was going to pat him down. Before starting to pat defendant down, Sergeant Durano asked him whether he had anything of concern on his person, and defendant replied that he had marijuana in his front right pocket. Both Sergeant Durano and Officer Shemanske noticed that the hems of defendant's pants were wet, which indicated that he had been in a grassy area because it was dry out that night. Sergeant Durano had been searching in grassy areas and his pants hems were wet from the dew. During the pat down, Sergeant Durano noticed a large bulge in defendant's left back pocket, which was found to be a mask and two small baggies of marijuana. The small amount of marijuana found on defendant was more consistent with personal use than selling. The officers took defendant into custody, placed him in the police car, and drove him to the police station.

¶ 9 The trial court denied defendant's motion to quash his arrest and suppress evidence. The trial court found that the police did not have probable cause to arrest defendant based on the comparison of his attire to the missing offender's description, defendant's wet pants hems, and

his being in the general vicinity of the home invasion 3½ hours after the incident. However, those factors did give the police reasonable suspicion to conduct a *Terry* stop, and probable cause to arrest defendant arose once the police found drugs on him.

¶ 10 At the hearing on the motion to suppress defendant's lineup identifications by the Sayegh family, the defense argued that the lineups were unduly suggestive because defendant stood in the middle position of the five lineup participants and no one else was dressed like him. Detective Jim Emmett testified that the lineups were conducted on August 16, 2006. At about noon, he and two lieutenants contacted the Markham courthouse to obtain fillers for the lineup. Detective Emmett picked up George Sayegh and his two daughters, Reta and Rima, and drove them to the courthouse. Detective Emmett told them they were going to view a lineup but did not discuss with them who, if anyone, was in custody.

¶ 11 George, Reta and Rima each signed a lineup advisory form. Then they separately viewed the lineup and wrote on their forms which position number they chose. Furthermore, they waited in a separate area until each family member finished viewing the lineup. Each of them picked defendant, who was standing in the number three position. The photograph of the lineup shows that the man in the number one position wore a white T-shirt; the man in the number two position wore a gray T-shirt with black writing on it; defendant, who was in the number three position, wore a black or dark navy blue shirt with blue and white skull graphics on it; the man in the number four position wore a white T-shirt, and the man in the number five position wore a white or grayish T-shirt with some black writing or design on it.

¶ 12 Lieutenant Mark Jensen was in charge of putting the lineup together. He and another officer reviewed the people present at the courthouse for bond hearings to find possible fillers and chose four people who looked the most like defendant. They told defendant to pick his position in the lineup, and defendant chose the number three spot. Lieutenant Jensen did not make any determinations about what the lineup fillers would wear because the clothing choices were limited by the limited number of people in bond court on any given day.

¶ 13 The trial court found that the lineup was not unduly suggestive and denied defendant's motion to suppress the lineup identifications.

¶ 14 The State proceeded to trial against defendant on four counts of home invasion and four counts of aggravated kidnapping. Officers Lipinski and Shemanske, Sergeant Durano, Detective Emmett and Lieutenant Jensen all testified consistently with their testimony at the hearings on the pretrial motions. George, Reta and Rima Sayegh also testified at the trial. The State's evidence established that when George drove home shortly after midnight on the date of the offense, he entered his home through the back door and two men with guns, later determined to be defendant and codefendant Thomas, followed him inside and put a gun to his head. Seventeen-year-old Reta had been watching television in a small room by the door with her seven-year-old sister Rachel. Reta saw defendant and Thomas from two feet away, and Rachel screamed and cried. Reta got up, and defendant grabbed her arm, put a gun to her head, and told her to "shut [Rachel] up." Meanwhile, 19-year-old Rima was watching television in another room, and George's father, Yousef, was asleep in his bedroom on the lower level. George's wife, son and another daughter were asleep upstairs.

¶ 15 Rima walked down the hallway to see what was wrong. She saw defendant, who was wearing all black and standing behind Reta while pointing a gun at Reta's head. Rachel was behind them, followed by George and then codefendant Thomas, who was wearing a sports jersey and holding a gun to George's head. Rima was only five feet away from defendant and

Thomas. Rima, Reta and George all testified in court that defendant was wearing a long-sleeved black hoodie. Defendant asked Reta if anyone else was at home, and Reta responded that her grandfather was sleeping downstairs. Defendant grabbed Rima's shoulder and led her downstairs. Rima held Rachel in her arms to prevent her from looking in defendant's direction.

¶ 16    Defendant and Thomas took the family into the grandfather's bedroom and made them sit on the bed. Defendant continued to tell Rachel to shut up. Defendant and Thomas asked where the drugs and safe were, and George, Rima and Reta replied that they had neither. Defendant pointed his gun at the family while Thomas searched George's pockets. Defendant unplugged the phone, put it in his pocket, and told Rima to tie everyone's wrists with the phone cord. Then defendant took Reta out of the room to retrieve her mother's purse by the front door. When defendant and Reta returned, defendant made her dump the purse contents onto the floor. Reta thought she heard someone walking upstairs, possibly her mother, so she loudly said in Arabic, "don't come down here." Defendant told her to stop talking.

¶ 17    Then, defendant went upstairs, and Rima heard the side door of the house open and close. When defendant returned to the bedroom, he told Thomas that they had the wrong house. Defendant and Thomas moved the family to the living room. At this time, George, Rima and Reta saw codefendant Hicks, who was wearing all gray and standing on the landing by the side door. Hicks was wearing a hoodie to cover his face, but George saw his face although Rima and Reta did not. Rima saw Hicks' hands and could tell he was black. Reta noticed that Hicks was wearing gray pants and black shoes. The family sat on the sofa, and defendant demanded money and drugs from them. Then defendant went upstairs for a short while. When he returned, he looked out the window and told Thomas that the police were outside and they had been caught. Defendant and Thomas opened the front door, Thomas threw his gun into the bushes, and then they ran. George estimated the offenders were in the house for about 25 minutes.

¶ 18    The police told the family to stay inside their house and lock all the doors. A little while later, the police came back with Hicks, and George identified him as the third intruder, who was wearing all gray and did not have a gun. Rima and Reta had not seen Hicks' face and thus did not identify him. Shortly thereafter, the police brought Thomas to the door, and George, Rima and Reta identified him as one of the two initial intruders.

¶ 19    The next afternoon, George, Rima and Reta were taken to the courthouse to view a lineup. They were placed in separate rooms, viewed the lineup separately, and did not see each other until after the lineup. All three of them identified defendant as one of the offenders. George, Rima and Reta identified defendant in the lineup by looking at his face, not his clothes. Rima identified defendant as the person who had been wearing all black during the home invasion. Rima and Reta had not seen the shirt defendant wore during the lineup before; Rima stated that defendant had worn a black hoodie during the home invasion, and Reta stated that he had worn a black sweatshirt, "like a pullover."

¶ 20    The police recovered a loaded firearm in a garbage can approximately 1½ blocks east of the Sayegh home. The police did not find any black hoodie, black pants or dark clothing.

¶ 21    Assistant State's Attorney Kelly Grekstas testified concerning the facts surrounding the taking of defendant's written statement while he was in custody. Defendant's statement was published to the jury. According to this statement, defendant was selling drugs on the street on the evening of August 14, 2006, when Thomas approached him and told him about a robbery.

They went to Thomas's house, and Thomas telephoned "Moody," later determined to be Hicks, who spoke to defendant about the details of the robbery. Hicks told defendant that they were going to a drug dealer's home to steal his drugs. Fifteen minutes later, Moody picked up defendant and Thomas in a dark-colored Acura sport utility vehicle driven by a man named "Main." Main drove to the suburbs, stopped at a house, retrieved a plastic grocery bag, and gave the bag to Hicks. Hicks gave defendant a black gun. Main drove the group to a house in a residential area, and Hicks exited the car. When Hicks returned, he said, "The dude should be making a run." Thomas and defendant went to the back door, hid and waited. Then a "Mexican-looking" man drove up in front of the house, exited his vehicle and went to the back door. Thomas pulled out his gun, walked up to the man, and put the gun to the man's head.

¶ 22     Thomas and defendant forced the man into his home. Defendant saw a girl upstairs, told her to come down, and asked her who else was in the house. Another girl came out of a room with a small crying child. Defendant and Thomas led the family downstairs to an old man's bedroom. Defendant asked where the drugs were, but the man kept repeating that he did not have any drugs. One of the girls asked Thomas to stop pointing the gun at her, and defendant told Thomas to lower his gun. Thomas searched the man's pockets, and defendant began to suspect that this was not the drug house. Defendant went outside to talk to Hicks, and Hicks and Main went inside the house with defendant. Thomas now had the family sitting on a couch and some of their wrists were tied. Defendant went upstairs and saw Hicks and Main searching the kitchen. Defendant went back downstairs and heard one of the girls speaking a foreign language. Defendant went back upstairs, looked outside and saw police cars. Hicks and Main were already gone. Defendant told Thomas the police were outside, so they went out the front door. As defendant ran, he threw his gun into a yard. He hid in a dark yard for a few hours before eventually coming out and attempting to find a bus stop. He walked past the police station when a police car stopped and arrested him.

¶ 23     Defendant was found guilty of four counts of home invasion and four counts of aggravated kidnapping. Thereafter, defendant moved the court for a new trial, arguing that the pretrial motions were wrongly decided. The trial court denied defendant's motion. The State petitioned to have defendant sentenced to natural life as an habitual offender based on two separate armed robberies to which he had pled guilty in 1998 and 2003. Defendant argued that he should not be found an armed habitual criminal because one of his prior convictions was void. The trial court sentenced defendant to natural life in prison, and defendant appealed.

¶ 24                              II. ANALYSIS
¶ 25     On appeal, defendant contends that (1) the trial court should have granted his motion to quash his arrest and suppress evidence because the police stopped him without reasonable suspicion where he was walking on a public street near the site of the home invasion but 3½ hours after it had occurred; (2) the trial court should have granted his motion to suppress the lineup identifications, which were unduly suggestive based on defendant's attire; (3) the statutory provision regarding the sentencing of habitual criminals is unconstitutional as applied to defendant because one of his prior qualifying convictions–a 1998 armed robbery–occurred when he was 17 years old and, thus, his current natural life sentence constitutes punishment too severe for conduct that he had committed as a juvenile; (4) his natural life sentence based on being adjudicated a habitual criminal should be vacated because it was predicated on a 2003

armed robbery conviction that is void; and (5) his multiple convictions for home invasion violate the one-act, one-crime rule.

¶ 26                                    A. *Terry* Stop and Arrest

¶ 27        Defendant contends the trial court erred in denying his motion to quash his arrest and suppress evidence because the police did not have a reasonable suspicion that he had committed a crime at the time he was stopped. Defendant argues he did not match the description of the missing offender and was not doing anything unusual when he was walking down a public street near the site of the home invasion 3½ hours after it had occurred.

¶ 28        A reviewing court accords great deference to the factual findings of the trial court, which will be reversed only if they are against the manifest weight of the evidence, but reviews *de novo* the trial court's ultimate determination to grant or deny the defendant's motion to suppress. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006); *People v. Cox*, 202 Ill. 2d 462, 466 (2002). "On such a motion the defendant bears the burden of proof that the search and seizure were unlawful." *People v. Williams*, 164 Ill. 2d 1, 12 (1994). In reviewing a ruling on a motion to suppress, the reviewing court may consider evidence presented at trial as well as evidence presented at the suppression hearing to affirm the ruling. *People v. Sims*, 167 Ill. 2d 483, 500 (1995).

¶ 29        The fourth amendment to the United States Constitution guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const., amend. IV. "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause" (*People v. Johnson*, 237 Ill. 2d 81, 89 (2010)), but the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), recognized an exception to the warrant requirement. Pursuant to *Terry*, "an officer may, within the parameters of the fourth amendment, conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity, and such suspicion amounts to more than a mere 'hunch.' " *People v. Gherna*, 203 Ill. 2d 165, 177 (2003) (citing *Terry*, 392 U.S. at 27).

¶ 30        Not every encounter between the police and a private citizen results in a seizure. *Luedemann*, 222 Ill. 2d at 544. "Courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or '*Terry* stops,' which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) [consensual] encounters that involve no coercion or detention and thus do not implicate fourth amendment interests." *Id.*

¶ 31        To justify a *Terry* stop, a police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 21. See also 725 ILCS 5/107-14 (West 2010) (after a peace officer identifies himself, he may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense, and may demand the name and address of the person and an explanation of his actions). When reviewing the officer's actions, a court applies an objective standard to decide whether the facts available to the officer at the time would lead an individual of reasonable caution to believe that the actions taken were appropriate. *People v. Close*, 238 Ill. 2d 497, 505 (2010). Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot, the officer may briefly stop the suspicious person and make reasonable inquiries aimed at

confirming or dispelling his suspicions. *People v. Marchel*, 348 Ill. App. 3d 78, 80 (2004). A general description of a suspect coupled with other specific circumstances that would lead a reasonably prudent person to believe the action taken was appropriate can constitute sufficient cause to stop or arrest. *People v. Robinson*, 299 Ill. App. 3d 426, 431 (1998).

¶ 32     Because *Terry* permits an officer to briefly detain an individual to investigate the possibility of criminal behavior without probable cause to arrest, the mere restraint of an individual does not turn an investigatory stop into an arrest. *People v. Young*, 306 Ill. App. 3d 350, 354 (1999); see also *People v. Starks*, 190 Ill. App. 3d 503, 509 (1989) ("It would be paradoxical to give police the authority to detain pursuant to an investigatory stop yet deny them the use of force that may be necessary to effectuate the detention."). "The scope of the investigation must be reasonably related to the circumstances that justified the police interference and the investigation must last no longer than is necessary to effectuate the purpose of the stop." *People v. Ross*, 317 Ill. App. 3d 26, 31 (2000).

¶ 33     The circumstances of this case establish that the investigative stop was warranted. Specifically, the search for the missing third offender was "loosened" but ongoing when Sergeant Durano drove by defendant, who was walking about three blocks from the scene of the crime and in a completely residential area at about 4 a.m., which was less than four hours after the home invasion had occurred. Moreover, defendant was the only person the police had seen on the street in the area after the offense and apprehension of codefendant Hicks and Thomas, and only 55 minutes had elapsed since the police had loosened the search to try to draw the missing offender out of hiding. In addition, defendant matched the general description of the missing offender, whom Officer Lipinski and the Sayegh family had described as a black male, short, thin, and wearing black or dark clothing. Although defendant asserts the unique shirt he was wearing when he was stopped clearly does not fit the description of the offender, the police knew that the offender had been hiding for a few hours and, like codefendant Hicks, would likely have tried to discard some of the clothing he had worn during the offense to change his appearance. Under these facts, it is inconsequential that defendant no longer wore the long-sleeved black hoodie that members of the Sayegh family saw him wear during the offense.

¶ 34     In addition, at some point during their encounter with defendant, the police noticed that the hems of his pants were wet, which was more consistent with running and hiding than defendant's explanation that he had simply walked from a friend's house, presumably on the sidewalk. The officers had been part of a three-hour search that covered backyards, bushes, and lawns, and Sergeant Durano's pants hems also were wet from the dew. A reasonable inference from this information was that defendant had been hiding in grassy areas. Although defendant was observed and stopped about 3½ hours after the home invasion, that lapse of time is not unreasonably removed in time from the crime because the police saw him flee the house on foot, believed he was hiding in the completely residential area, and searched the area for over 2 hours before loosening the perimeter of the search area to draw him out of hiding. Moreover, defendant was the first person the police observed on the street since his flight from the crime scene and the police's immediate apprehension of codefendants Hicks and Thomas. The totality of these facts provided the reasonable articulable suspicion needed to stop defendant. See *People v. Ross*, 317 Ill. App. 3d 26, 30 (2000) (*Terry* stop was justified where the defendant was observed walking within minutes of the crime a short distance from the victim's home and he matched the description of the offender as a black man wearing a blue shirt);

*People v. Hopkins*, 363 Ill. App. 3d 971, 981 (2006) (*Terry* stop was justified where the defendant was observed within minutes of the crime and a short distance from the crime scene, and he met the description of the offender as a black male in his twenties); *People v. Starks*, 190 Ill. App. 3d 503, 505 (1989) (*Terry* stop was justified based on the general description of the suspect and the fact that the officer's sighting of the suspect was not unreasonably removed in time and space from the crime).

¶ 35    Defendant cites *People v. Smith*, 331 Ill. App. 3d 1049 (2002), and *People v. Kipfer*, 356 Ill. App. 3d 132 (2005), for the proposition that the lateness of the hour did not justify the stop simply because defendant was found either in a high-crime area or in a neighborhood in which he did not live. *Smith* and *Kipfer*, however, are distinguishable from the instant case. In *Smith*, there was no crime that had just taken place, and the officer stopped the defendant merely because he was walking in a high-crime area at 1:43 a.m., placed something in his pocket, clenched his fist, crossed the street and stood outside a known drug house. *Smith*, 331 Ill. App. 3d at 1054-55. In *Kipfer*, there was no crime that had just taken place, and the officer stopped and searched the defendant merely because the officer had seen the defendant emerge from behind a dumpster and begin to walk away. *Kipfer*, 356 Ill. App. 3d at 134-35. Here, in contrast, the search for a specific suspect in the area was ongoing albeit "loosened," and Sergeant Durano stopped defendant because he matched the general description of the missing offender as a short black male wearing dark clothing.

¶ 36    Using an objective standard, the facts and circumstances known to the officers warranted a person of reasonable caution to believe a stop was necessary to investigate the possibility of criminal activity. We conclude that the trial court properly denied defendant's motion to quash the arrest and suppress evidence, and his statement admitting his role in the home invasion was properly admitted into evidence.

¶ 37                              B. Lineup Identifications

¶ 38    Defendant argues the trial court erred in denying his motion to suppress identification testimony because the lineup was unduly suggestive. Specifically, defendant argues the police used an impermissibly suggestive lineup because he was the only individual out of the five participants wearing a colored shirt with "garish" graphics on it. Moreover, defendant stood in the middle, flanked by people wearing either white or light gray T-shirts. Defendant complains that the lineup violated section 107A-5 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107A-5 (West 2006)), because he appeared to be substantially different from the other lineup participants. Additionally, defendant argues the victims, in light of the corrupting effect of the suggestive lineup, did not have an independent basis for their in-court identifications of defendant where they did not have a good opportunity to view the offender during the offense and gave the police vague descriptions of the offender, and the lineup occurred almost 12 hours after the home invasion.

¶ 39    "Evidence of pretrial identifications of an accused by a witness must be excluded at trial only where (1) the procedure was unnecessarily suggestive and (2) there was a substantial likelihood of misidentification." *People v. Hartzol*, 222 Ill. App. 3d 631, 642 (1991). "Defendant has the burden of proving that the identification procedures were so unnecessarily suggestive as to give rise to a substantial likelihood of irreparable misidentification." *People v. Prince*, 362 Ill. App. 3d 762, 771 (2005). If defendant meets his burden to establish suggestiveness, the court must next decide whether the identification testimony is so tainted as

to be rendered unreliable. *People v. McTush*, 81 Ill. 2d 513, 520 (1980). Courts must look to the totality of the circumstances when reviewing a claim of an unnecessarily suggestive identification. *Prince*, 362 Ill. App. 3d at 771. Furthermore, the reviewing court may consider evidence adduced at trial as well as at the suppression hearing when reviewing the correctness of the trial court's denial of a motion to suppress. *People v. Flores*, 256 Ill. App. 3d 484, 495 (1993). A trial court's factual determination that an identification procedure was not unduly suggestive should not be reversed unless it is against the manifest weight of the evidence. *People v. Gaston*, 259 Ill. App. 3d 869, 875 (1994). However, the court's ultimate determination on a motion to suppress is reviewed *de novo*. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001).

¶ 40   Defendant's argument lacks merit. Our review of the record establishes that the police procedures employed in the lineup were not suggestive in any way and were completely in accordance with the law. Defendant chose the middle position in the lineup and cannot credibly complain about that choice now on appeal. Moreover, Lieutenant Jensen testified credibly that he found lineup fillers from the men present at the courthouse for their bond hearings and selected black men as similar as possible to defendant's height and weight. Lieutenant Jensen did not make any determinations about the type of clothing either defendant or the fillers wore. Defendant wore the clothing he was arrested in, and Lieutenant Jensen's choice of fillers was limited by the types of people available for the lineup at that time and whatever attire they happened to be wearing. The photograph of the lineup establishes that the height, weight, hair, skin tone and age of the fillers and defendant looked very similar. Defendant makes much of the fact that he wore a dark-colored shirt with "garish" skull graphics whereas the fillers wore either white or light gray T-shirts with little or no embellishment. Defendant's shirt hardly rendered the lineup unduly suggestive, especially here where he simply wore his own clothing, he was not ordered to wear that clothing, and the fact that the fillers wore lighter-colored shirts than defendant wore was not by any design of the police to spotlight defendant. See *People v. Johnson*, 149 Ill. 2d 118, 146 (1992). Moreover, the credible testimony of the victims and Officer Lipinski established that they did not see defendant wearing the skull shirt during the home invasion.

¶ 41   Furthermore, the witnesses testified credibly that the police did not tell the victims that the offender was in the lineup or discuss who, if anyone, was in custody, and George, Rima and Reta viewed the lineup separately and waited in a separate area after they each viewed the lineup. In addition, the lineup was conducted only 12 hours after the crime occurred, and the identifications of defendant as the offender by George, Rima and Reta were inherently reliable because they had ample opportunity to view defendant during the home invasion that lasted 25 minutes. Defendant's face was never concealed, and the victims' eyes were not covered. Both Rima and Reta testified that they saw defendant from a distance of five feet or less after he entered the home. Moreover, they looked at defendant when he pointed his gun at the victims, asked them questions, entered or left the room, and ordered them to move, sit, get things and do things. George, Rima and Reta also showed a high level of certainty when they immediately or within 45 seconds identified defendant in the lineup as the offender with the gun who wore black clothing or a black hoodie during the offense. Their testimony established that defendant's face was easily identifiable to them, despite his being seen in the lineup in a different shirt.

¶ 42    We conclude that the trial court properly denied defendant's motion to suppress the identification testimony.

¶ 43                                C. Mandatory Life Sentence

¶ 44    Defendant challenges the imposition of his natural life sentence based on his commission of his third Class X felony and pursuant to section 33B-1 of the Criminal Code of 1961 (720 ILCS 5/33B-1(a)(e) (West 2006) (hereinafter the Habitual Criminal Act, which provision is currently section 5-4.5-95 of the Unified Code of Corrections (730 ILCS 5/5-4.5-95 (West 2012)))). First, defendant argues his sentence is unconstitutional because one of his two prior Class X convictions–the 1998 armed robbery–occurred when he was only 17 years old and, thus, results in punishment too severe for conduct he committed as a juvenile. Second, defendant argues his other prior Class X conviction–the 2003 armed robbery–is void because his 6-year prison term for that offense is less than the minimum 21-year term mandated for committing that robbery with a firearm.

¶ 45    Whether a sentence is constitutional and whether a sentence is void are questions of law, which we review *de novo*. *People v. Hauschild*, 226 Ill. 2d 63, 72 (2007); *People v. Sharpe*, 216 Ill. 2d 481, 486-87 (2005).

¶ 46                    1. Constitutionality of the Natural Life Sentence

¶ 47    Defendant argues that, as applied to him, the statute under which he was adjudicated an habitual criminal and sentenced to life in prison is unconstitutional. Defendant contends that denying him any hope of release from prison based in part on conduct he committed when he was under the age of 18 is cruel, degrading and grossly disproportionate. Defendant complains that under the Habitual Criminal Act, there is no judicial consideration of a defendant's youthfulness at the time of the qualifying offenses or determination of whether a defendant is capable of rehabilitation before he is imprisoned for the remainder of his life. Defendant argues that this is error because in *Graham v. Florida*, 560 U.S. 48, 71 (2010), the Court found that the sentencing goals of retribution, deterrence, incapacitation and rehabilitation did not justify the imposition of a natural life term on a juvenile for a nonhomicide offense. Moreover, the Court stated that "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Id*. at 76.

¶ 48    To support his argument that his natural life sentence under the Habitual Criminal Act is unconstitutional, defendant cites the eighth amendment's prohibition on cruel and unusual punishment; *Roper v. Simmons*, 543 U.S. 551, 569, 578 (2005) (juveniles are categorically less culpable than adult offenders, and it is unconstitutional for persons under 18 years of age to receive the death penalty); *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012) (mandatory life imprisonment without parole for those under the age of 18 at the time of their crimes violates the eighth amendment prohibition on cruel and unusual punishment); the proportionate penalties clause of the Illinois Constitution; and *People v. Miller*, 202 Ill. 2d 328 (2002) (multiple-murder sentencing statute as applied to a 15-year-old juvenile, who was convicted under a theory of accountability, violated the proportionate penalty clause of the state constitution).

¶ 49    Defendant acknowledges that he was not a juvenile when the 2006 home invasion and kidnapping offenses were committed, but he argues that the reasoning of *Graham*, *Roper*,

*Miller v. Alabama*, and *People v. Miller* applies to his case because his mandatory life sentence was based in part on his conduct as a 17-year-old juvenile when he committed armed robbery in 1998. Defendant asks this court to intervene in the mechanical application of the Habitual Criminal Act presented by this case because his mandatory life sentence based in part on conduct committed as a juvenile contravenes our evolving standards of decency.

¶ 50    Defendant's argument lacks merit. His sentence of life imprisonment is not merely the result of criminal conduct he committed in 1998 when he was 17 years old but, rather, results from his third Class X felony conviction, which occurred within 20 years of his first Class X felony conviction and long after he had reached adulthood.

¶ 51    "Legislative enactments, including those which declare and define conduct constituting a crime and determine the penalties imposed for criminal conduct, are presumed constitutional." *People v. Dunigan*, 165 Ill. 2d 235, 244 (1995). The party challenging the statute has the burden of rebutting that presumption. *People v. Cornelius*, 213 Ill. 2d 178, 189 (2004). We review *de novo* the issue of a statute's constitutionality. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 200 (2009). Pursuant to the Habitual Criminal Act, every person who has been twice convicted of an offense that contains the same elements as an offense now classified in Illinois as a Class X felony, and who is thereafter convicted, within the 20-year prescribed time period, of a Class X felony, shall be adjudged an habitual criminal and sentenced to a term of natural life imprisonment. 730 ILCS 5/5-4.5-95(a) (West 2012).

¶ 52    In enacting mandatory life sentences under the Habitual Criminal Act, the legislature considered the rehabilitative potential of the offenders by limiting the application of this statute to those offenders who have a third serious felony conviction within a prescribed time period. *Dunigan*, 165 Ill. 2d at 246. The offenders have the opportunity to present mitigating evidence and demonstrate their rehabilitative potential when they are sentenced for their first two serious felony offenses. *Id.* "The [Habitual Criminal] Act may be invoked only after a defendant has twice demonstrated that conviction and imprisonment do not deter him from a life of crime." *Id.* at 246. "Thus, the [Habitual Criminal] Act unquestionably represents a careful legislative consideration of both the seriousness of the offense and the rehabilitative potential of offenders subject to its terms." *Id.* at 246-47.

¶ 53    Defendant was not 17 years old when he committed his third Class X felony, for which he is being punished in this case. We conclude that the natural life sentence properly imposed by the trial court in this case is not unconstitutional. Defendant's adjudication as an armed habitual offender, of which he had fair and ample warning, punished him for the new and separate crime he committed in 2006 as an adult after having already been convicted of two prior Class X felonies.

¶ 54                              2. Voidness of Prior Armed Robbery Conviction

¶ 55    Next, defendant argues his natural life sentence, imposed based on his third Class X felony conviction, should be vacated because he does not qualify as an habitual criminal since his second Class X felony conviction for a 2003 guilty plea to armed robbery is void. Specifically, defendant asserts that the 2003 Class X conviction is void because the 6-year prison term he received for that armed robbery, pursuant to his agreement with the State, did not include the statutorily mandated 15-year firearm sentencing enhancement.

¶ 56 To support his argument, defendant cites *People v. White*, 2011 IL 109616, ¶¶ 4-6, where the defendant pled guilty to murder and possession of contraband, the factual basis for his plea established that the victim was shot with a handgun, and the trial court, in accordance with the parties' plea agreement, imposed a sentence that did not include the mandatory firearm enhancement. The *White* court held that the defendant's sentence was void because the trial court accepted the factual basis that a firearm had been used and, thus, had no authority to impose a sentence that did not conform to statutory sentencing requirements and exceeded its authority when it ordered a lesser sentence. *Id.* ¶ 20.

¶ 57 Defendant argues that the factual basis for his 2003 armed robbery guilty plea revealed that he was armed with a firearm when he committed the offense, but he did not receive a sentence that included the required 15-year sentencing enhancement. Defendant acknowledges that the firearm sentencing enhancement had been found unconstitutional in 2007 because the enhancement violated the proportionate penalties clause of the Illinois Constitution. See *Hauschild*, 226 Ill. 2d 63. However, shortly thereafter in October 2007, Public Act 95-688 corrected the proportionate penalties clause violation and rendered the 15-year enhancement constitutional. Pub. Act 95-688 (eff. Oct. 23, 2007); see *People v. Blair*, 2013 IL 114122, ¶ 27. Defendant also acknowledges that Public Act 95-688 corrected the constitutional violation four years after his 2003 Class X felony conviction. Nevertheless, citing the unpublished order *People v. Taylor*, 2013 IL App (4th) 110633-UB, defendant argues that the effect of Public Act 95-688 applies retroactively and thereby renders his sentence in connection with his 2003 guilty plea to armed robbery void because he did not receive the firearm sentencing enhancement. Accordingly, defendant concludes that, because his 2003 armed robbery conviction is void, he does not qualify as a habitual criminal, and this court should vacate his natural life sentence and remand for a new sentencing hearing.

¶ 58 Defendant's argument lacks merit. First, our supreme court recently held that the holding in *White* does not apply retroactively to convictions that were final at the time *White* was decided. *People v. Smith*, 2015 IL 116572, ¶ 1. Defendant's 2003 conviction was final when *White* was decided in 2011, so the holding in *White* does not apply retroactively to render his six-year sentence void. Furthermore, defendant's reliance on *People v. Taylor*, 2013 IL App (4th) 110633-UB, is misplaced because our supreme court recently reversed the ruling of the appellate court and held, *inter alia*, that Public Act 95-688 did not retroactively correct the proportionate penalties violation. *People v. Taylor*, 2015 IL 117267, ¶ 36. Consequently, defendant's 2003 armed robbery sentence, which did not include the firearm sentencing enhancement, is not void because he was properly sentenced without the enhancement four years before the legislature cured the proportionate penalties clause violation. We conclude that the trial court properly sentenced defendant to natural life in the instant case under the Habitual Criminal Act based on his three Class X felony convictions.

¶ 59                                    D. One-Act, One-Crime Rule

¶ 60 Defendant argues, the State concedes, and this court agrees that defendant's multiple convictions for home invasion violate the one-act, one-crime rule. See *People v. Sims*, 167 Ill. 2d 483, 523 (1995) (a defendant can stand convicted of only one count of home invasion where there was only one entry regardless of the number of victims); *People v. Cole*, 172 Ill. 2d 85, 102 (1996) (a single entry into the home will support only a single conviction of home invasion, regardless of the number of occupants); *People v. Hicks*, 181 Ill. 2d 541, 545-49

(1998) (even if there were multiple entrants into the dwelling, the defendant can only be convicted of one count of home invasion because the legislature did not intend to convict the defendant as a principal and an accomplice for the same crime). Accordingly, we vacate three of defendant's four convictions for home invasion and order the mittimus be corrected to reflect one conviction for home invasion.

¶ 61                                III. CONCLUSION

¶ 62        In light of the forgoing, we vacate three of defendant's four convictions for home invasion pursuant to the one-act, one-crime rule but otherwise affirm the judgment of the circuit court of Cook County.

¶ 63        Affirmed in part and vacated in part; mittimus corrected.