2020 IL App (1st) 161789-U

No. 1-16-1789

Order filed February 6, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 06 CR 20688 |
| | ) | |
| CHARLES LAWSON, | ) | Honorable |
| | ) | Allen F. Murphy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's postconviction claim that his trial counsel was ineffective for failing to present expert testimony about eyewitness identifications lacks arguable merit.

¶ 2    At a jury trial in 2011, defendant Charles Lawson was convicted of home invasion and aggravated kidnapping and was sentenced to life in prison. The evidence against him included the testimony of three victims who identified him as one of the perpetrators and his custodial statement confessing his involvement. In 2015, defendant filed a *pro se* postconviction petition

alleging that his trial counsel was ineffective for failing to call an expert to testify about the reliability of eyewitness identifications. The circuit court summarily dismissed the petition as frivolous and patently without merit. On appeal, defendant argues that the summary dismissal was inappropriate because his ineffective assistance claim is arguably meritorious. For the reasons that follow, we affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4    Shortly after midnight on August 15, 2006, two men with guns entered the Oak Forest home that George and Iman Sayegh shared with their five children (Mike, Reta, Rima, Robin, and Rachel) and George's elderly father (Yosef). Seventeen-year-old Reta and seven-year-old Rachel were watching television in a small room on the main floor. Fifteen-year-old Rima was in Mike's bedroom on the same floor watching television as Mike slept. Iman and Robin were sleeping in another bedroom on the main floor, and Yosef was asleep in his bedroom in the basement.

¶ 5    George, who had just arrived home, parked his truck in the driveway and entered the house through the side door. He spoke briefly with Reta and Rachel before turning around to close the door behind him. When he did so, he saw two black men standing behind him with guns drawn. At trial, George identified defendant as one of the intruders and testified that he was wearing a black hoodie and black pants. Reta, who initially observed the intruders from a distance of two feet, likewise identified defendant at trial as the man dressed in black. The intruders directed George, Reta, and Rachel toward a hallway at gunpoint. Hearing Rachel's

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

cries, Rima walked out of Mike's bedroom and (from a distance of five feet) saw the two men pointing guns at George and Reta. At trial, Rima identified defendant as one of the men and testified that he was wearing a long-sleeved black hoodie and black pants. After Rima emerged from the bedroom, defendant asked whether anyone else was home, and Reta responded that their grandfather was asleep in the basement.

¶ 6    The intruders then led George, Reta, Rima, and Rachel downstairs to Yosef's bedroom, where they forced Reta to tie the others' wrists with a telephone cord. The intruders asked the Sayeghs where their drugs and safe were, and the Sayeghs responded that they had neither. Defendant then led Reta upstairs to retrieve her mother's purse. After Reta brought the purse downstairs, defendant forced her to empty its contents onto the floor and search through them as he pointed his gun at her head. While doing so, Reta heard footsteps upstairs and said loudly in Arabic, "Don't come down here." Defendant then went upstairs by himself, and Rima heard the side door open and close. When defendant came back downstairs, he told the other intruder that they were in the wrong house.

¶ 7    The two men then led the Sayeghs to the living room next to Yosef's bedroom. On the way, George, Reta, and Rima noticed a third man upstairs. Once in the living room, the intruders again asked the Sayeghs where the drugs and safe were, and the Sayeghs again told them they did not have either. Defendant then went upstairs once more. On his way back to the basement, he looked out the front door, saw a number of police officers outside, and exclaimed to his partner that they had been caught. Both men then went back upstairs and exited the house through the front door. George estimated that the men had been in the house between 20 and 25 minutes.

¶ 8     Around 12:30 a.m., Sergeant Scott Durano and Officers Steven Lipinski and Bill Shemanske of the Oak Forest Police Department were notified of a home invasion in progress at the Sayegh residence. When Officers Lipinski and Shemanske arrived at the scene, they observed a man running from the house's side door. Officer Shemanske chased the man on foot and eventually found him hiding in a parked car less than a block away. Meanwhile, Officer Lipinski observed two other men—a heavyset black man wearing a sports jersey and a thin black man wearing black clothing—fleeing through the front door. With the assistance of a police dog, the officers quickly located the man in the sports jersey lying under a parked car a few houses away. Both men were brought to the Sayeghs' house, where George, Reta, and Rima identified the man in the sports jersey as one of the gun-wielding intruders, and George identified the other man as the person he had seen upstairs.

¶ 9     The officers continued to search for the third offender until 3:00 a.m., when they decided to relax the search in an effort to draw the person out of hiding. At 4:00 a.m., Sergeant Durano saw a man wearing blue jeans and a black T-shirt with blue and white graphics standing on a street corner three blocks from the Sayeghs' house. Sergeant Durano radioed Officer Shemanske for a description of the third offender and told him that he might have located the suspect. When Officer Shemanske arrived, he and Sergeant Durano approached the man—later identified as defendant—and asked him what he was doing in the area. Defendant told the officers that he had been at a friend's house trying to sell drugs, but he could not recall the location of the house or his friend's name. Sergeant Durano conducted a pat down search of defendant and found a mask and two small baggies of marijuana in his pocket. The officers then took defendant into custody and drove him to the police station.

¶ 10    Later that day, around noon, George, Reta, and Rima went to the Markham courthouse to view a lineup. They each reviewed and signed a form advising them that the suspect may or may not be in the lineup, that they were not required to identify a person in the lineup, and that they should not assume that the officer administering the lineup knew the identity of the suspect. The three viewed the lineup separately and waited in a different room when they were finished so that they would have no contact with those who had not yet viewed the lineup. The lineup consisted of defendant and four fillers who were similar to defendant in height, weight, age, hair style, and skin tone. Defendant stood in the middle position and wore the black T-shirt with blue and white graphics that he was wearing when he was arrested. Three of the fillers wore white T-shirts and the fourth wore a gray T-shirt with black writing. George, Reta, and Rima each identified defendant as the intruder who had been dressed in black.

¶ 11    The following day, at 12:30 p.m., Assistant State's Attorney (ASA) Kelly Grekstas interviewed defendant at the Oak Forest police station. At the outset, ASA Grekstas read defendant his *Miranda* rights from a preprinted form, after which defendant himself read the form aloud and indicated that he understood and agreed to waive his rights. After they spoke for about an hour, defendant agreed to allow ASA Grekstas to memorialize their conversation in writing. ASA Grekstas then handwrote a six-page statement, which defendant read aloud and signed. In the statement, which was published to the jury, defendant admitted that he and three other men went to the Sayeghs' home thinking that it belonged to a drug dealer from whom they could steal drugs. Defendant stated that he and one of the other men hid outside the house with guns and snuck up behind the owner as he opened the door. Once inside the house, defendant and the other intruder forced the man and three girls into an elderly man's bedroom downstairs.

Defendant asked the man where the drugs were, but the man kept saying that he did not have any. Suspecting that they were in the wrong house, defendant went upstairs to talk with his other accomplices. One of the accomplices insisted they had the right house, and defendant went back downstairs. After hearing one of the girls say something in a foreign language, defendant went upstairs again and saw police cars outside. He alerted his fellow intruder that the police had arrived and exited the house through the front door. He hid for a few hours in a dark yard before emerging to look for a bus stop, at which point the police found and arrested him. In the statement, defendant apologized to the Sayegh family, explaining that the incident had been a misunderstanding. He also stated that he had been treated well by the police and had been allowed to sleep, use the washroom, and eat and drink while in custody.

¶ 12    The defense theory at trial was that the Sayeghs had misidentified defendant due to an unnecessarily suggestive lineup and that defendant had been coerced into making a false confession. Defendant filed pretrial motions to suppress his confession and the identifications, but the trial court denied both motions after evidentiary hearings. The defense focused on the same themes at trial, both on cross-examination and in closing argument. Defense counsel emphasized that being held at gunpoint during a home invasion was a traumatic and stressful event for the Sayeghs. Defense counsel also noted that the Sayeghs described defendant as being dressed entirely in black during the home invasion, even though he was dressed in blue jeans and a black T-shirt with blue and white graphics when he was arrested a few hours later. Defense counsel argued that the Sayeghs had mistakenly identified defendant in the lineup because he stood out as the only person wearing a dark shirt with bright graphics. In addition, defense

counsel urged the jury to disregard defendant's inculpatory statement because the ASA wrote it and because defendant had been in custody for 33 hours at the time.

¶ 13    The jury found defendant guilty of four counts of home invasion and four counts of aggravated kidnapping, and the trial court sentenced him to life in prison. On direct appeal, we vacated three of the home invasion convictions under the one-act, one-crime rule but otherwise affirmed defendant's convictions and sentence. *People v. Lawson*, 2015 IL App (1st) 120751. Among other things, we rejected defendant's contention that the trial court erred in denying his motion to suppress the Sayeghs' identifications. We found that the lineup was "not suggestive in any way" and that the Sayeghs' identifications of defendant were "inherently reliable" in light of the ample opportunity they had to view defendant from close range during the 25-minute home invasion. *Id.* ¶¶ 40-41.

¶ 14    After we decided his direct appeal, defendant filed a *pro se* petition for postconviction relief. The petition asserted that defendant's trial counsel was ineffective for failing to present expert testimony concerning eyewitness identifications and for preventing defendant from testifying on his own behalf, and that defendant's counsel on direct appeal was ineffective for failing to challenge the denial of his motion to suppress his custodial statement. In support of his first claim, defendant alleged that trial counsel ignored his request to call a licensed psychologist to testify about various factors that affect the reliability of eyewitness identifications. The circuit court summarily dismissed the petition, concluding that defendant's claims were frivolous and patently without merit. Defendant then filed a timely notice of appeal.

¶ 15                                    II. ANALYSIS

¶ 16    Defendant contends that the circuit court erred in summarily dismissing his postconviction petition because it presented an arguably meritorious claim that his trial counsel was ineffective for failing to call an expert witness to testify about the unreliability of eyewitness identifications. We review the summary dismissal of a postconviction petition *de novo*. *People v. Boykins*, 2017 IL 121365, ¶ 9.

¶ 17    Under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)), a criminal defendant may collaterally attack his conviction by filing a petition alleging that his constitutional rights were substantially violated at trial. *People v. Tate*, 2012 IL 112214, ¶ 8. The Act creates a three-stage process for adjudicating postconviction petitions. *People v. Allen*, 2015 IL 113135, ¶ 21. At the first stage, the circuit court independently reviews the petition to assess whether it is frivolous or patently without merit. *Tate*, 2012 IL 112214, ¶ 9. A petition may be summarily dismissed as frivolous or patently without merit only if its claims have "no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 12 (2009). A claim has no arguable basis in law if it "is based on an indisputably meritless legal theory" or "is completely contradicted by the record." *Id.* at 16. A claim has no arguable basis in fact if it is based on "'fanciful factual allegation[s],'" including allegations "that are 'fantastic or delusional' or belied by the record." *People v. Morris*, 236 Ill. 2d 345, 354 (2010) (quoting *Hodges*, 234 Ill. 2d at 16-17).

¶ 18    To prevail on an ineffective assistance of counsel claim, a defendant generally must show that his counsel's performance was deficient and that he suffered resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance is established by showing that

"counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] would have been different." *Id.* at 694. To survive the first stage of postconviction review, however, a defendant raising an ineffective assistance of counsel claim need only show that "it is *arguable* that counsel's performance fell below an objective standard of reasonableness and [that] it is *arguable* that [he] was prejudiced." (Emphasis added.) *Hodges*, 234 Ill. 2d at 17.

¶ 19 Defendant contends that his trial counsel was arguably deficient for failing to present expert testimony concerning the reliability of eyewitness identifications. It is now widely accepted by social scientists that various factors can affect the accuracy of an eyewitness's identification of a suspect, including the duration of a witness's encounter with the suspect, the presence of a weapon during the encounter, the level of stress experienced by the witness, the distance from which the witness viewed the suspect, the amount of time that passed between the encounter and the witness's identification of the suspect, and whether the witness and suspect are of different races. See *Perry v. New Hampshire*, 565 U.S. 228, 243-44 (2012); *State v. Henderson*, 27 A.3d 872, 904-08 (N.J. 2011). While these findings are "well settled" in the scientific community, many of them remain "'largely unfamiliar to the average person.'" *People v. Lerma*, 2016 IL 118496, ¶ 24 (quoting *State v. Guilbert*, 49 A.3d 705, 723 (Conn. 2012)). Our supreme court has thus held that, in appropriate cases, expert testimony concerning the reliability of eyewitness identification is both relevant and admissible. *Lerma*, 2016 IL 118496, ¶ 26. Indeed, in *Lerma*, our supreme court held that the trial court abused its discretion when it denied a defendant's request to present expert testimony on the subject where the evidence against the

defendant consisted entirely of two eyewitness identifications (one of which was admitted under an exception to the hearsay rule and thus was not subject to cross-examination) and where "most [of the factors noted above were] either present or possibly present." *Id.*

¶ 20    Defendant contends that in his case, as in *Lerma*, expert testimony concerning the reliability of eyewitness identifications would have been probative and admissible. But the question here is not whether the trial court would have abused its discretion if it refused to allow defendant to present such testimony, but whether defendant's trial counsel was ineffective for failing to offer it. These are "manifestly different" questions. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 39. "Decisions concerning which witnesses to call at trial and what evidence to present on [a] defendant's behalf" are "matters of trial strategy" that are "generally immune from claims of ineffective assistance of counsel" unless "counsel's chosen trial strategy is so unsound that counsel entirely fails to conduct any meaningful adversarial testing." *People v. Reid*, 179 Ill. 2d 297, 310 (1997). Reviewing courts must be "highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007).

¶ 21    At the time of defendant's trial, which took place several years before *Lerma* was decided, it was "common practice in Illinois" to exclude expert testimony on the reliability of eyewitness identification. *Lerma*, 2016 IL 118496, ¶ 24; see *Macklin*, 2019 IL App (1st) 161165, ¶ 38 (noting that such testimony was "routinely excluded" before *Lerma*, "at least partly due to skepticism expressed by the supreme court"). "[T]he trend in Illinois [at the time] preclude[d] expert testimony on the reliability of eyewitness identification on the ground that it invade[d] the province of the jury as trier of fact." *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 54. In light

of the law at the time of defendant's trial and the deference owed to trial counsel on matters of trial strategy, there is no arguable basis for concluding that counsel's decision not to present expert testimony on the reliability of eyewitness identifications—but to rely instead on cross-examination and closing argument to highlight potential weaknesses in the Sayeghs' identifications of defendant—fell below an objective standard of reasonableness. See *Macklin*, 2019 IL App (1st) 161165, ¶ 38 ("Representation based on the law prevailing at the time of trial is adequate, and counsel is not incompetent for failing to correctly predict that the law will change.").

¶ 22    Nor is there any arguable basis for concluding that defendant was prejudiced by counsel's decision. Defendant notes that several of the factors that can affect the reliability of eyewitness identifications are present in his case, such as the stressfulness of the encounter, the presence of a weapon, and the cross-racial nature of the identifications. He thus argues that expert testimony would have bolstered his contention that the Sayeghs' identifications were unreliable and resulted from an unnecessarily suggestive lineup in which he was the only participant wearing a dark T-shirt with bright graphics. But as we found on direct appeal, several other factors—such as the prolonged duration of the Sayeghs' encounter with defendant, the close distance from which they viewed him, and the relatively short passage of time between the encounter and the lineup—rendered the Sayeghs' identifications "inherently reliable." *Lawson*, 2015 IL App (1st) 120751, ¶ 41.[2] We also noted on direct appeal that a photograph of the lineup "establishe[d] that

---

[2] Defendant cites the scientific consensus that eyewitnesses "tend to overestimate time frames." *Lerma*, 2016 IL 118496, ¶ 8. But he does not contest the accuracy of George's estimate that the home invasion lasted between 20 and 25 minutes. And regardless of the exact duration of the home invasion, there is no question that it was a relatively prolonged encounter rather than a brief interaction. See *Henderson*, 27 A.3d at 905 (noting that "while there is no minimum time

the height, weight, hair, skin tone[,] and age of the fillers and defendant looked very similar" and concluded that the mere fact that defendant wore a dark T-shirt with prominent graphics while the fillers wore light T-shirts with little or no embellishment "hardly rendered the lineup unduly suggestive." *Id.* ¶ 40. The fact that the Sayeghs independently identified defendant after separately viewing a non-suggestive lineup "enhance[d] and corroborate[d] the accuracy of their respective identifications." *Macklin*, 2019 IL App (1st) 161165, ¶ 33; see also *United States v. Williams*, 522 F.3d 809, 812 (7th Cir. 2008) ("Even if the risk that any one identification would be mistaken is substantial, the risk that multiple witnesses would make the same error is smaller.").

¶ 23    Finally, unlike in *Lerma*, the case against defendant did not rest entirely on eyewitness identifications. Rather, the jury heard defendant's custodial statement admitting to his involvement in the home invasion and largely corroborating the details provided by the Sayeghs. Defendant asserts that his statement should be given little weight because he did not write it himself and because he had been in custody for more than 30 hours at the time he made it. But ASA Grekstas testified that defendant agreed to allow her to memorialize his statement in writing and that defendant read the entire statement aloud before signing it. Moreover, in the statement, defendant indicated that he had been treated well by the police and had been allowed to sleep, use the washroom, and eat and drink while in custody. After a pretrial evidentiary hearing, the trial court found that defendant made the statement voluntarily. Defendant did not challenge that determination on direct appeal and has now abandoned the contention that his appellate counsel was ineffective for failing to do so. In light of defendant's confession and the

required to make an accurate identification, a brief or fleeting contact is less likely to produce an accurate identification than a more prolonged exposure") (internal quotation marks omitted).

inherent reliability of the Sayeghs' identifications, there is no reasonable probability that the result of defendant's trial would have been different if trial counsel had presented expert testimony concerning the reliability of eyewitness identifications. Because there is no arguable merit to defendant's claim that his trial counsel was ineffective for failing to present such testimony, the trial court did not err in summarily dismissing defendant's postconviction petition.

¶ 24                                     III. CONCLUSION

¶ 25    For the foregoing reasons, we affirm the circuit court's judgment summarily dismissing defendant's postconviction petition.

¶ 26    Affirmed.