2022 IL App (1st) 1192110-U

No. 1-19-2110

Second Division
August 16, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS,<br><br>    Plaintiff-Appellee,<br><br>    v.<br><br>RANDALL WHITE,<br><br>    Defendant-Appellant. | ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the<br>Circuit Court of<br>Cook County.<br><br><br><br>No. 14 CR 17233<br><br><br><br>Honorable<br>Carl B. Boyd,<br>Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court properly denied the motion to suppress pretrial witness identifications as there was no evidence of an improper show-up; the lineup procedures were not unduly suggestive; and the eyewitness testimony was independently reliable. Evidence at trial was sufficient to establish defendant's guilt beyond a reasonable doubt.

¶ 2   Following a bench trial, defendant-appellant, Randall White, was convicted of multiple counts of armed habitual criminal, armed violence, armed robbery, and armed vehicular invasion.

Defendant's post-trial motions for reconsideration and a new trial were denied. On appeal, defendant argues that the trial court erred in denying his motion to suppress the identification evidence from the "*de facto*" show-up and at the subsequent lineup. For the reasons that follow, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4      On September 2, 2014, defendant was indicted in the circuit court of Cook County on three counts of attempt murder in the first degree (720 ILCS 5/9-1(a)(1) (West 2012); one count of armed habitual, criminal (720 ILCS 5/24-1.7(a) (West 2012); one count of armed violence in conjunction with vehicular invasion (720 ILCS 5/33A-2(a) and 5/33-18-6) (West 2012); four counts of armed robbery (720 ILCS 5/18-2(a)(2) (West 2012); one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2012); four counts of vehicular invasion (720 ILCS 5/18-6(a) (West 2012); three counts of unlawful use or possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2012); and six counts of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (3)(A-5) (West 2012).[1]

¶ 5      Prior to trial, defendant filed a motion to suppress three pretrial identifications made by Reginald Carson, Nikesha Short[2] and Deandre Johnson, also known as "Bo." First, defendant argued that Carson's eyewitness identification at the scene of defendant's arrest constituted an improper one-man show-up. Second, defendant argued that Carson, Short, and Johnson's identifications were made pursuant to an improperly suggestive lineup procedure, where defendant remained in the same position during all three viewings, was the only individual in the lineup

_____

[1] The State later dismissed the unlawful use of weapon by a felon and aggravated unlawful use of weapon charges.

[2] Nikesha Short testified that her nickname is "Keisha" or "Kesha."

wearing clothing that matched the description of the perpetrator, and witnesses were shown a simultaneous lineup instead of a sequential series. The motion to suppress was denied and the case proceeded to a bench trial, after which defendant was convicted and sentenced to natural life. The testimony taken at trial is set out later in this disposition. We recite below the relevant testimony adduced over the course of the three-day suppression hearing.

¶ 6                                A. Suppression Hearing

¶ 7                                1. Nikesha Short

¶ 8     Short testified as follows. On August 31, 2014, at 1:30 p.m., she was sitting in the driver's seat of her car in front of a building at 141st and Stewart when she became a victim of a robbery.[3] She was alone at first, and Reginald Carson was "standing by the car" when the robbery occurred. The suspect, a "heavyset, tall, dark" man wearing a black top, gray or beige colored shorts, and a black baseball cap, approached her car and asked Carson for a lighter.

¶ 9     Following the robbery, the suspect, later identified as Randall White, left, as did Carson. Short called the police and gave a description of the suspect over the phone, indicating that he was "running with [her] child's bag of blocks" and that he had on a black hat, black shirt, and shorts.

¶ 10    Short drove to the police station on her own. When she arrived, it was evening, and she waited around for some time until she went upstairs with a heavyset officer. She was led to a "secluded" area, and no one else was in the room when she entered. She talked to an officer, who took her statement and told her he would show her a lineup of individuals. When viewing the lineup, it was "just her and a police officer" in the lineup room, which was on the first floor of the station. Before viewing the lineup, she signed an advisory form. Five individuals were in the

---

[3] Details concerning the robbery are set out later in our recitation of the trial testimony.

lineup, but she did not recall how they were dressed. It "took about one minute" to view the lineup and identify the suspect as White.

¶ 11 After the lineup, Short went upstairs to a different secluded room, and "was there for a long time." She did not see Carson until she was leaving the station, as they were coming out of different areas in the police station on the second floor. However, she saw Carson as she was leaving the lineup room. It appeared that Carson was going into a room with another officer, but Short did not know where. She also saw Johnson before she went to the police station, and after she left. She and Johnson did not talk about what happened earlier that day.

¶ 12 On cross-examination, Short testified that the police told her that the suspect might not be in the lineup, that she was not obligated to make an identification, and was not to assume that the officer in the lineup room with her knew who the suspect was. She indicated that she picked out an individual in position number four in the lineup. Short also provided a positive in-court identification of defendant as the offender.

¶ 13 When asked how long it took her to identify the suspect in the lineup, Short testified that "it didn't take [her] long" because "she had seen him up close" as she had been in the driver's seat at the time of the robbery, and he was "near [her]." She did not identify him because he was wearing shorts, or what shirt or shoes he was wearing; rather, she "recognized his face." Short did not tell Carson or Johnson who she picked in the lineup, and she was never allowed to speak to either prior to viewing the lineup. She also did not know which position defendant was in prior to the viewing. On redirect examination, Short admitted that she was still shaken up from the incident, but that she looked at everyone in the lineup prior to making an identification in a short period of time.

¶ 14                                   2. Sergeant Mark Kozeluh

¶ 15    Sergeant Mark Kozeluh of the Riverdale Police Department testified that on August 31, 2014, while on assignment in the 13900 block of School Street, he heard two vehicle engines "revving out of the ordinary," and walked to the area where he heard the sounds. He saw two vehicles located about a half block away in the middle of an intersection and observed two gunshots fired from one of the vehicles. One vehicle, described as a "box-style Chevy Caprice," took off after the shots were fired and the other remained.

¶ 16    After hearing the gunshots, Kozeluh approached the remaining vehicle and spoke to the man in the car, who he later came to know as Carson. He did not recall if Carson gave him a description of the suspect at the time, but if it was discussed, "it was very brief." Although unsure, Kozeluh believed that Carson told him that "the person in the car shot at him," and was taking off.

¶ 17    Kozeluh got into his vehicle and caught up to the Chevrolet. He observed four people exit the car but could only describe the driver who was a black male, between six feet and six feet two inches, at about two hundred pounds. He did not recall what the driver was wearing. Kozeluh identified the driver of the car as defendant via in-court identification.

¶ 18    Kozeluh "gave chase" to defendant and ultimately located him lying face-down in an empty swimming pool in the backyard of a residence. He leaned over the pool and ordered defendant to show his hands. Because defendant did not initially comply, Kozeluh deployed a taser "at least twice." Another officer, Officer Gray,[4] stepped into the pool and placed handcuffs on defendant. Both officers then took defendant out of the pool and led him outside the residence.

¶ 19    Kozeluh further testified that Carson had not been at the scene when defendant was removed from the pool, and at the time, Kozeluh was unaware that Carson had followed the

[4] Officer Gray's first name does not appear in the record.

pursuit. He noticed Carson as he and Officer Gray were escorting defendant to the police car. Carson approached them and said, "that was him" or "that was the guy."

¶ 20 On cross-examination, Kozeluh testified that he did not know Carson's name at the time of their initial conversation, but that when he first encountered him, Carson told him that "the guy with the Blue Chevy robbed him and fired shots." Kozeluh, in a marked police car with his lights and sirens activated, pursued the Chevrolet. The Chevrolet eventually came to a stop in the 13900 block of State Street, in an alley, and ended up crashing into a light pole.

¶ 21 Kozeluh did not ask Carson to make an identification at the scene of defendant's arrest; instead, Carson approached him first and initiated the conversation. Kozeluh and his fellow officers "were just trying to move [White] to the car" and as Carson spoke, they continued to put defendant in the car.

¶ 22 Back at the scene of the robbery, Kozeluh and other officers proceeded to collect information about the robbery from Carson and others. Kozeluh was not involved in conducting the lineups.

¶ 23 On re-direct examination, Kolzeuh reiterated that he only noticed Carson at the scene when defendant was being placed into custody. Kozeluh did not see Carson when the occupants of the Chevrolet exited the vehicle before it crashed, although it was "entirely possible" that he was at the scene. However, Kolzeuh's focus "was on the driver."

¶ 24                                    3. Officer Mark Kashirsky

¶ 25 Officer Mark Kashirsky testified that around 2 p.m. on August 31, 2014, he began his shift at the Riverdale Police Department and was provided a description of a suspect in custody for an armed robbery that occurred around 1:30 p.m. in Riverdale. The description was that of a black male, bald, with a beard, wearing a black T-shirt. He did not recall the description including a hat.

¶ 26    Kashirsky began to look for fillers for a lineup. Riverdale had a written policy on how to conduct a lineup, and he had also been trained as an investigator to conduct one. Lineups conducted in 2014 were not videotaped, pictures of the fillers and the suspect would be utilized, and witnesses would be provided with lineup advisory forms. There was also no requirement that the person conducting the lineup be unaware of who the suspect was, but those policies had changed. Kashirsky stated that the written policy in 2014 "was extremely outdated."

¶ 27    Regarding the lineup in this case, Kashirsky testified that three witnesses arrived separately at the station. He did not know who arrived first but believed it was Short. Per normal procedure, all three were taken upstairs to separate rooms. After the viewing of a lineup, each individual would normally be brought back upstairs. Kashirsky admitted that there was no report indicating in this case when the witnesses went back upstairs or when they left.

¶ 28    Kashirsky further testified that the lineup room was located on a separate floor. He conducted the lineup, and although other officers were present, he did not know specifically who they were. He read an advisory form to each witness, and each read the form separately. Defendant had been the only filler in the lineup wearing a black T-shirt or black tank top.

¶ 29    On cross-examination, Kashirsky testified that all three witnesses had been separated and were not allowed to talk to each other. He read the advisory form out loud to each witness; informed each that the suspect in the case might not be present; that the witness was not obligated to make an identification; and that the witness should not assume that the officer administering the lineup and photo spread knew who the suspect was. He also instructed the witnesses to "let me know [the suspect's] number if you recognize them." He did not tell anyone in which position defendant had been placed.

¶ 30     Carson was the first to view the lineup, followed by Johnson and Short. Kashirsky reiterated that at no time did he or any other officer in his presence suggest or influence any of the three witnesses to pick out defendant in the lineup, and he did not observe any physical or emotional condition of any of the three witnesses that would impair their identifications.

¶ 31     Kashirsky testified that to find the fillers, he drove around and located any male black subjects that would fit the clothing description, facial features, age range, hair, weight, height, and any gear to the best of his ability. All five individuals in the lineup were "kind of balding" and he was looking for heavier-set individuals. Kashirsky did not believe he switched around the fillers and defendant in the lineup, but defendant picked out position number four because "that was where he wanted to be" and that was protocol per his "investigator training." Kashirsky testified that it is current policy to move the witnesses around in between multiple witness viewings. On redirect examination, Kashirsky testified that to his knowledge, Carson had seen defendant in the custody of the police prior to the lineup. Kashirsky was aware of who the suspect was in the lineup.

¶ 32     Following the testimony, defendant argued that the witness identifications were tainted and should be suppressed. First, defendant argued that although Carson's presence was not a *per se* show-up, his presence at the scene of the arrest tainted any identification given at the lineup. Because Kozeluh had only apprehended one individual, there was no possible way Carson could have identified any other individual. As to the lineup, defendant argued it was "improperly suggestive" because the only individual wearing a black T-shirt and shorts was defendant and no other filler fit the physical description of the suspect except defendant; Kashirsky knew who the alleged perpetrator was in the lineup; and although Short had testified that she had never spoken to another victim about the robbery, it had been Kozeluh's testimony that he had interviewed the victims at the site of the robbery. Last, defendant highlighted recent changes to Illinois lineup

procedures effective in 2015, which indicated that whenever practical, an officer conducting the lineup should not be involved in the investigation of the case or know the identity of the suspect; that in a photo lineup, a witness be shown one photo at a time; and that a suspect be placed in a different position each time a lineup viewing occurred.

¶ 33 The State responded that there had been neither a show-up, given that the responding officers had been unaware of Carson's presence, and at the time the lineup procedures were conducted, they were in accordance with the law.

¶ 34 The trial court denied defendant's motion. As to the show-up, the trial court found that Carson's viewing had been "accidental" and "spontaneous," and the testimony had shown that no police procedures had been instituted to conduct a one person show-up. As to the lineup procedures, the trial court acknowledged that Illinois law had been amended and that different lineup procedures were now in place, but that at the time of the arrest in 2014, existing protocols had been followed and the testimony did not show evidence of an improper lineup.

¶ 35                                    B. Bench Trial

¶ 36 On February 19, 2019, the case proceeded to a bench trial. The prosecution indicated that it was proceeding on counts one through fourteen of its criminal complaint and moved to *nolle prosequi* counts fifteen through twenty-three. The prosecution also requested a *Montgomery* hearing should defendant choose to testify.[5]

---

[5] Pursuant to *People v. Montgomery*, 47 Ill. 2d 510 (1971), the trial court has discretion to allow the defendant to be impeached with any prior convictions.

¶ 37    After opening statements, the following witnesses were called to testify for the State: (1) Carson, (2) Short, (3) Kozeluh, (4) Kashirsky, and (5) Officer Gray; and for the defense: (1) Dr. Mary Macklin and (2) defendant.[6]

¶ 38                                    1. Carson

¶ 39    Carson testified as follows. On August 31, 2014, at or about 1:30 p.m., he was at 141st and Stewart in Riverdale. He had been at home, working on his truck, when Short, who he sometimes referred to as "Keisha," pulled up in her car, a tannish four-door Lexus, with her two children, Jacarri and Lamaria. Lamaria ran inside the house. Carson walked up to Short's car, opened the front passenger side door and sat inside. He then grabbed Jacarri from the backseat, placed him in his lap and began to play with him. The passenger door remained open. Carson's right leg was out the door, and his foot was on the ground. Short remained in the driver's seat.

¶ 40    While seated in the car, Carson saw someone approach. Carson provided a positive in-court identification of defendant as the individual who had approached the car. Defendant "came though the gangway" on Tracy Avenue between Short's home and Carson's own residence. Defendant wore shorts "that kind of looked like pants," and were "big and grayish" or light blue colored, a black T-shirt, and some kind of hat. Defendant either had short hair or was almost bald because the baseball cap did not fit entirely over his head.

¶ 41    Defendant came up to Carson's side of the car and "asked for a light." Carson gave him a light, and then defendant pulled a gun from out of his side, pointed it at Carson and Jacarri, and said "give me that shit." Carson did not know what defendant meant as he was "kind of in shock."

---

[6] We note that Sergeant Gilbert Plumey of the Riverdale Police Department also testified on behalf of the State regarding his search of defendant's person once in custody.

Carson laid back as defendant reached into the car, "went into" Carson's pockets and began pulling items out, such as money, credit cards, a driver's license, wallet, and cell phone.

¶ 42    During this time, Johnson, who Carson referred to as "Bo," pulled up to the area and walked towards the front of Short's car. Defendant then pointed the gun at Bo and told him to come over to him. Defendant touched Bo's body while still holding the gun in his hand and told Bo to give him the chain Bo was wearing around his neck. Bo gave defendant his chain and his wallet, but Carson could not see if anything else was taken or if Bo remained on the scene. Carson remained in Short's car, watching the whole event.

¶ 43    Defendant returned to Short's car, pointed to a bag on the floor between Carson's legs, asked what was in it, and pointed the gun between Jacarri's head and Carson. Defendant "snatched" the bag from the floor and reached inside the car and "snatched" the keys from the ignition. He then grabbed Short's wallet, which was located on her side, threw all the items into the same bag and proceeded to leave through the gangway. Carson did not know how much time had elapsed, but it seemed to last "forever" and "felt like a very long time."

¶ 44    After defendant left, Carson exited Short's car, jumped into his own truck, and drove towards the intersection at Tracy and 141st, where he saw an "old bluish" Chevrolet. The Chevrolet was perpendicular to his own at the intersection so that the driver's side of the car was close to the driver side of Carson's car. Carson saw the driver and recognized him as "the person that just stuck me up" and again made an in-court identification of defendant as the driver. He stated that there was someone sitting in the front of the car with defendant, as well as potentially kids in the backseat, but other than defendant, he did not recognize any of them. Carson and defendant made eye contact, and then defendant made a right turn onto School Street. Carson continued to follow defendant and did not lose sight of him.

¶ 45    At some point, defendant pulled over and stopped his car. Carson also stopped his truck about two to three car lengths behind the Chevrolet and got out. The driver also got out of his car and Carson again recognized him as the individual who robbed him. The driver then pointed a gun in Carson's direction and "shot at" him twice. Carson jumped behind his car door to avoid the shots. He did not know where the gunshots landed but recognized the gun as the one used during the robbery. After the gunshots, the driver got back into his car and continued to drive forward. Carson did not follow him and backed up his car on School for "security reasons" and so that he could watch to see where the driver was going. He did not lose sight of the vehicle.

¶ 46    The police arrived soon after. Carson told an officer what happened, and the police officer drove in the direction of defendant's vehicle. Carson stayed there for a moment and saw defendant's car "come out" and that the police had begun to chase him. Carson then followed the police officer in his own vehicle to chase after defendant, never losing sight of defendant's car.

¶ 47    The vehicle eventually came to a stop. He did not recall seeing anyone leave the vehicle. An officer then told Carson "to stay over there." When Carson arrived on the scene, he recognized defendant sitting on the ground in handcuffs. A police officer asked him if he could "identify this guy," and he responded, "yeah, this dude just robbed me and shot at me." Carson performed another in-court identification of defendant, indicating that he was the same individual he saw handcuffed. After he identified defendant, Carson left the area and police escorted him back home.

¶ 48    Later that evening, Carson went to the Riverdale police station, talked to a detective, and viewed a lineup. Prior to the lineup, a detective showed him a lineup and photograph advisory form, which he read and signed. He was not told by anyone who to pick. He picked out defendant in the lineup and identified him in a photo spread. He did not see Short at the police station.

¶ 49    On cross-examination, Carson testified that the suspect had been wearing a hat, but he could not remember if the hat ever came off during the robbery. He did not see the individual's hair and did not know if he was bald or had "a high-top fade." Carson was not sure if the suspect grabbed the bag or Short's car keys first, or how much money was taken from him. He observed defendant putting those items in the bag because he was "right there in front of [him]."

¶ 50    Carson further testified that when he initially followed the Chevrolet, he was never more than two to three car lengths, or approximately twelve feet away. When he made eye contact with defendant at the intersection, defendant was wearing a dark baseball cap. He did not know if the passenger had on a hat.

¶ 51    After defendant shot at him, a police officer arrived on the scene. He told the officer that "somebody stuck me up around on Stewart." When viewing defendant in handcuffs, he could not recall if he had on a hat, but believed he was wearing a black T-shirt and shorts. Carson stated that defendant was the only one in handcuffs, and that an officer approached him and asked him to identify defendant. At the lineup, Carson recalled giving a statement. He did not know how long he was at the station. He did not see Bo at the station, and he did not speak to Short at any time. When he identified defendant in the lineup, everyone was seated.

¶ 52                                    2. Short

¶ 53    Short testified as follows. Prior to the robbery, she was in her car with Jacarri and Lamaria. Carson had first been outside of her car, and then got into the front passenger seat and placed Jacarri on his left leg against the middle console of the vehicle. Lamaria got out of the car and did not rejoin them. While sitting in her car with Carson, an individual, whom she identified at trial as defendant, approached. Prior to the robbery, she had never before seen defendant. He had emerged from between the buildings where she and Carson lived. Defendant first walked past the car, then

came back around and stopped at her car's front passenger door. After asking Carson for a lighter, defendant said, "give me what you got," pulled out a gun and pointed it at her and Carson.

¶ 54 Johnson pulled up and was emerging from his girlfriend's car. At that time, defendant had retrieved Carson's phone and wallet, and Carson was handing him "some stuff." Johnson came between Carson's car and her car, and defendant robbed him. Defendant grabbed Johnson and pointed the gun between Johnson and Carson. Defendant took Johnson's chain, money, and phone, and kept telling Johnson to give what him what he had and that if Johnson turned around, he would shoot him. Afterwards, Johnson ran across the street.

¶ 55 Defendant returned to the front passenger side of Short's car and continued robbing Carson. Short observed him grabbing Carson's wallet and phone and kept repeating "give [me] what [you have] and to "not make [me] do it to [you]." Defendant reached out and grabbed Short's car keys out of the ignition while still holding the gun. Short's wallet, which contained her identification, was attached to her keys. Defendant said, "this wasn't for me," and grabbed the navy-blue bag with blocks located in the front seat in between Carson's legs. Defendant asked what was in the bag, pointed the gun between Jacarri's head and Carson's chest and shoulder area, and then fled with the bag through the gangway.

¶ 56 After defendant left, Short called the police. Carson left her car and went to his own. Short did not know where Carson went from there. She later heard a couple of gunshots but did not know from which direction they came. Short later went to the police station and viewed the lineup with a police officer. She was given a lineup advisory form and photo lineup spread, which the police officer read and explained to her. She signed and initialed each form. Short then identified defendant in position number four in the lineup.

¶ 57     On cross-examination, Short testified that the suspect had on a baseball cap, a black T-shirt, and shorts, and that the hat stayed on the individual's head during the robbery. She knew he was bald because she could not see any hair but also could not see the top of his head. When the gun was pulled out, she looked at it and was concerned for her son's safety and made sure to pay attention to where the gun was aimed. She was able to see Johnson being robbed because he had been walking towards the front of her car towards the gangway.

¶ 58     Short did not recall speaking to Kozeluh at the scene of the robbery and did not know that someone had been arrested at that time. Contrary to her testimony at the suppression hearing, Short testified that she travelled to the police station with a police officer. She was there at the station for at least eight hours. While there, Short spoke to Kashirsky and a prosecutor. She did not know that Carson had seen defendant in custody. Prior to the lineup, she was not shown any photos and was in a room with one or two officers. She gave a description to Kashirsky but did not remember if her description included "bald head." She told Kashirsky that the suspect had worn a hat, a black T-shirt, and shorts. She stated that she had never seen the suspect wearing a black tank top and that during the lineup, everyone had stood up and she did not see them when they were sitting down.

¶ 59                                    3. Kozeluh

¶ 60     Sergeant Kozeluh's testimony regarding pursuit and apprehension of defendant is recited in detail above. We recount here only that testimony at trial which may be different and also relevant to the issues on appeal.

¶ 61     After taking defendant from the swimming pool, Kozeluh walked him to the squad car. He saw Carson on the scene. No officer had asked Carson to identify defendant at the time, and he told Carson to leave in order to secure the scene. Kozeluh searched the Chevrolet and found a black and gray revolver on the floorboard of the driver's seat, a wallet on the floor, some children's

toys in a bag, keys, and miscellaneous clothing. He secured the firearm, observed that it had live rounds in it, and that there were two spent casings.

¶ 62    On cross-examination, Kozeluh testified that when he heard the gunshots, he did not see anyone with a gun and did not know from where the shots had come. During the chase, he had gotten fairly close to the Chevrolet. He knew there was a black male in the passenger seat, but he did not know if he was wearing a hat or a black T-shirt. He did not recall what the driver was wearing then, or what he was wearing when taken into custody. Kozeluh did not recover a hat in the car, and he did not recall defendant wearing a hat when he exited the Chevrolet. Carson, whose car was parked on the street with Officer Gray's car, left his vehicle when Kozeluh was escorting defendant. Carson got about fifty feet away from defendant and "started blurting things out."

¶ 63    On re-direct examination, Kozeluh testified that no victim gave him a description of the individual that committed the robbery, no one mentioned a black hat, and he was not searching for one when he searched the blue Chevrolet.

¶ 64                                     4. Kashirsky

¶ 65    Kashirsky led the investigation of the armed robbery of Short, Johnson, and Carson, which included a lineup. He provided an in-court identification of defendant as the individual in custody at the time. He conducted the lineup with the witnesses and interviewed them separately. Kashirsky was the only officer in the room with all three victims. Carson viewed the lineup at 9:54 p.m. and ended it at 9:55 p.m., identifying position number 4 as the suspect. Short viewed the lineup at 10:01 p.m. and ended it at 10:03 p.m., identifying position number 4 as the suspect. Kashirsky never told Carson or Short to pick a specific person.

¶ 66    On cross-examination, he testified that Short never provided a description that included the suspect with a hat on, and that her description at the time was black male, bald with a beard. The

fillers and suspect were placed in a room, and typically there would be an officer present with them. Under current policy, suspects are now able to choose where they want to stand. He did not document that defendant picked position four. He could not recall if anyone in the lineup stood up, but all were viewed all at once.

¶ 67                                                     5. Gray

¶ 68    Officer Gray testified that she had been working on August 31, 2014, near 139th and School. She was in a car alone when, at approximately 1:30 p.m., she heard gunshots and she and Kozeluh walked over to investigate. She subsequently left her original assignment and arrived on-scene at a house reported via radio transmission by Kozeluh, where allegedly one of the offenders was hiding in a swimming pool. She observed defendant in the pool and made an in-court identification of him as the same individual discovered in the pool.

¶ 69    Following Officer Gray's testimony, the State rested.[7] Defendant's motion for directed verdict was denied and the defense proceeded to present its case.

¶ 70                                              6. Dr. Mary Macklin

¶ 71    Following *voir dire* by the State and over the State's objection, Dr. Mary Macklin was qualified as an expert witness in memory perception and eyewitness identification. Dr. Macklin testified as follows. She had reviewed police reports, photos of a live lineup procedure, grand jury transcripts, police clerical forms, and transcripts of two witnesses from earlier court dates to prepare for her testimony. She evaluated this case to determine if there were "any potential memory concerns or issues that might be relevant," and believed that there were issues concerning a show-

_____

[7] The parties stipulated to, *inter alia*, the following: (1) a gunshot residue test did not disclose residue on either of defendant's hands; (2) no prints on the gun submitted for latent fingerprint testing were attributable to defendant; and (3) Illinois Secretary of State vehicle records identified a 1992 Chevrolet registered to Randall White.

up and lineup procedures which may have "potentially contaminated" the procedural lineup. She opined that the witness identifications in this case were not reasonable because on her review of the formal procedures utilized, as well as the "inadvertent circumstances with one of the witnesses seeing the suspect in an unofficial[,] non-controlled showup[.]"

¶ 72    Dr. Macklin stated that "memory is not perfect" and has not "evolved to be used as evidence." The first memory report is often the best, and that although anything after is not necessarily unreliable, it "must be taken with a grain of salt." Any "post-event information" may affect a memory, specifically when witnesses are communicating with other witnesses, looking at photos, or being interviewed multiple times.

¶ 73    Dr. Macklin identified various issues that could be causes for unreliable or faulty identifications, including "witness or environmental variables," such as lighting, distance, the quickness of an event, and the witness's levels of fear or stress. She offered that "obviously a gun pointed in your face is going to be scary," but that one's attention may be more focused on the gun rather than the individual pointing the gun, thus affecting memory. She further stated that it is "easier to describe clothing than it is to describe faces," and that drugs have a negative impact on memory.

¶ 74    Dr. Macklin testified that other relevant variables included "system variables," which refer to policies and procedures of the criminal justice system, such as separating the witnesses during interviews. As to lineups, the current recommended number of fillers is at least four, but five is recommended to protect the suspect. The suspect should not "unduly stand out" from the fillers with regard to facial features, weight, height, or idiosyncratic aspects of their appearance, such as tattoos on their forehead. If multiple witnesses are involved, the lineups should not be viewed together, the witness should be repositioned each time, and the lineup should be conducted in a

"double-blind" fashion because if a police officer knows who the suspect is, they may give off "subconscious clues" to the witness as to who the suspect might be. Dr. Macklin characterized showups as "inherently suggestive" because the witness may automatically think that the person being shown is the perpetrator. There may be situations where a show-up is conducted *de facto* even without the intention of the police to do so. If an individual participated in a show-up, that person should never participate in a later lineup.

¶ 75     On cross-examination, Dr. Macklin testified that while she provided a "summary opinion on the relevant variables," she did not include in her report that the witness identifications were unreliable. Regarding her statement that the first "memory report" tends to be the most accurate, she clarified that the first memory report means the description of the suspect prior to any interaction with them, and not in the case of Carson's identification of defendant at the scene of his arrest. Dr. Macklin testified that while people are "good at giving basic descriptors of height, weight, race, and gender," it is more difficult for them to describe the nuances of an individual's face. As to clothing bias, she stated that if a defendant was wearing the same clothing he was in when he was arrested or when he committed the crime, a witness may tend to pick that individual in a lineup based on their clothing. The issue with Short's identification of defendant in the lineup was that defendant had been the only one wearing shorts, and his clothing was relevant to a description of a witness.

¶ 76     Dr. Macklin believed there was no intended show-up by the police, and the police did not have the opportunity to put safeguards in place. However, it was still a show-up because the witness was able to view the suspect and make an identification, which was inherently unreliable.[8]

---

[8] The parties then stipulated that both Carson and Short had testified that they had no contact with each other or Johnson prior to viewing the lineup.

The State listed all of the items found in defendant's car or that were recovered from his person, and Dr. Macklin agreed with the State that such items could constitute corroborating evidence to the crime.[9]

¶ 77                                    7. Randall White

¶ 78    Defendant testified that on August 31, 2014, at around 1 or 1:30 p.m., he was leaving his grandmother's home in Robbins, Illinois, with his nephew, Trevon Austin. He was wearing a black tank top, gray shorts, and black and gray Nike gym shoes. He did not have on a hat. He called an "associate of his" named "Chop" to meet up with him in Dolton, Illinois, to pick up marijuana. Once the two met, Chop asked him if he could take him to Riverdale to pick up a package. Defendant gave Chop the money for drugs, but he did not receive his purchase immediately and was going to get it on the way back.

¶ 79    Defendant proceeded to take Chop and Chop's friend "Breeze" to Riverdale. Chop sat in the front passenger seat, and Breeze, who defendant had just met, sat with defendant's nephew in the backseat. Defendant described Chop as being the same weight as him, and about two inches taller. Breeze was the same height as him, and fifteen to twenty pounds lighter. Chop wore a black T-shirt, a black Chicago Bulls hat, and some tan shorts. Defendant did not know where in Riverdale he was going, but Chop gave him directions.

¶ 80    Once defendant arrived at Chop's destination, Chop told him to pull over and park, which he did. Chop got out of the car and walked to a car located about two car spaces behind defendant. Chop began to talk to someone that was sitting in the car. During the time Chop was out of the car, defendant listened to the radio and glanced in his rearview mirror "once or twice." At some point,

---

[9] The parties stipulated that defendant had been searched at the police station, that Short's purse and keys were found in defendant's car, as well as the blue bag containing children's toys.

Chop disappeared. Defendant noticed that Chop was "taking longer than expected." Defendant then got out of his car, stood by the door, told Chop to "hurry up," and then got back in the car. Shortly after, Chop returned to the car and had a bag with him. Defendant testified that Chop said that "dude was trying to play him." After that, Chop gave defendant directions back to Dolton.

¶ 81 On the way back, defendant stopped at a stop sign, looked in the rearview mirror, and saw that a pickup truck bumped his car from behind. Chop turned around and said, "he knew who it was," indicating that it was the "guy [he] just got through dealing with," and told defendant to pull over. Defendant pulled over and parked, and Chop got out of the car and went back to the individual in the truck. Shortly after, Chop ran back to the car, said the individual from the truck had tried to shoot him, and told defendant to "hurry up" and take him back to Dolton. Defendant then noticed a police car with its lights on behind him. Defendant did not pull over because Chop told him "he was dirty," which defendant took to mean that Chop had drugs on him. Defendant did not have drugs on him but was scared and paranoid as he was on parole. Defendant "got into a chase with the police" and for a short time was able to get away. He subsequently exited the car and ran, and to his knowledge, so did everyone else.

¶ 82 Defendant ran into a yard, which had an empty swimming pool in it and tried to hide there. He climbed into the pool, but a police officer soon approached the pool with his gun drawn. The officer told him not to move or that he would "blow [his] head off." Defendant was lying on his back and extended his hands. The officer he knew as Kozeluh then approached with a taser and asked him to turn over on his stomach. Kozeluh then started tasing him at least two to three times, although defendant was not resisting. At some point, a female officer came into the pool and handcuffed him.

¶ 83 After the three officers removed him from the pool, he was searched, but had "nothing on [him]." The officers began to walk him through the gate, where they "basically tossed [him] over," and he injured his shoulder. Before placing him in the car, he was again searched. Shortly thereafter, he was again taken out of the car and stood by the back door of the car. He noticed that another police officer and an unidentified man, who he came to know as Carson, were standing together a short distance away. Defendant was then placed back in the police car.

¶ 84 At the station, he was "forced to do" a lineup, which consisted of five people. He was placed in position four for all three viewings as this was the only seat left. He was told to sit down but was made to stand up three times while no one else did.

¶ 85 On cross-examination, defendant testified that he had been driving his 1992 Caprice, which was registered to him and was his only car at the time. As he was driving, he was bumped from behind. He normally would not have let someone get away with that, but because Chop had identified the car behind him as the guy who Chop had been dealing with, defendant did nothing about it. Defendant testified that Chop's conversation with the individual in Riverdale may have lasted about ten minutes. When Chop came back to the car, he had a bag on him. Defendant did not know if Chop had a gun, but defendant and his nephew did not have one on them. Although Chop had told defendant that someone had shot at him, defendant had his radio on and did not realize they were gunshots. Instead, he thought they might have been fireworks.

¶ 86 Defendant denied knowing how a coin purse and keys got into his vehicle. He knew that Chop had come into his car with a bag but was not sure what was in it. He denied being searched at the police station, denied owning a gun and did not know how one ended up on the floorboard of the driver's seat of his car. Defendant testified that he requested to change positions in the lineup.

¶ 87    The defense rested and closing arguments followed. Defendant again reiterated that the lineup and show-up issues had tainted any witness identification, and that there was no physical evidence linking defendant to any of the charges.

¶ 88                            C. Trial Court Ruling

¶ 89    The trial court found defendant guilty of armed habitual criminal and armed violence (counts four and five), armed robbery of Carson, Short, Jacarri Short, and Johnson (counts six through nine) and vehicular invasion (counts eleven through thirteen). The State motioned to *nolle pros* the misdemeanor charges contained in counts four through six. On August 1, 2019, defendant's amended motion for reconsideration and a new trial was denied and the case proceeded to sentencing. Following consideration of factors in mitigation and aggravation, the court sentenced defendant to natural life.

¶ 90                              II. ANALYSIS

¶ 91    Defendant argues that the trial court improperly denied his motion to suppress Carson, Short, and Johnson's pretrial identifications. Specifically, he contends that Carson's identification at the scene of his arrest was procured through an unduly suggestive "*de facto*" show-up, and that the identifications at the police station were also improper because the lineup was suggestive, in that defendant "looked noticeably different than the other participants" and was the only one matching the witness's description of the suspect. Further, defendant argues that none of the eyewitness testimony was independently reliable to sustain the State's burden of proving that he was guilty beyond reasonable doubt, and that the State cannot seek solace in the harmless error doctrine to sustain his convictions.

¶ 92    When assessing the trial court's ruling on a motion to suppress a pretrial identification, our review is two-fold, in that we adopt the trial court's factual findings unless they are against the

manifest weight of the evidence. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 95. We also review *de novo* the legal question of whether suppression is warranted. *Id.* ¶ 61; *People v. Lawson*, 2015 IL App (1st) 120751, ¶ 39. Accordingly, we review the totality of the circumstances and the facts adduced at both the suppression hearing and at trial. *People v. Clifton*, 2019 IL App (1st) 151967, ¶ 60. Because our review of the legal question is *de novo*, "we may affirm on any basis found in the record." *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 25.

¶ 93    In a suppression hearing and at a bench trial, "it is for the trial judge to determine the credibility of the witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *People v. Slim*, 127 Ill. 2d 302, 307 (1989); *Bahena*, 2020 IL App (1st) 180197, ¶ 23. "On review, the trial court's judgment will not be set aside unless the proof is so unsatisfactory, improbable or implausible as to justify a reasonable doubt as to the defendant's guilt." *Slim*, 127 Ill. 2d at 307.

¶ 94    In assessing the reliability of identification testimony, Illinois courts have adopted the framework set forth by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972), commonly referred to as the "*Biggers*" factors. *Slim*, 127 Ill. 2d at 307. As correctly identified by the trial court, courts consider: (1) "the opportunity the victim had to view the criminal at the time of the crime; (2) the witness'[s] degree of attention; (3) the accuracy of the witness'[s] prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Id.* at 307-308. Although not relevant here, Illinois courts appear to have added a sixth factor, namely "acquaintance with the offender before the crime."[10] *People v. Luellen*, 2019

---

[10] The testimony at trial established that neither Carson nor Short knew defendant prior to the offense.

IL App (1st) 172019, ¶ 59; *In re J.J.*, 2016 IL App (1st) 160379, ¶¶ 23, 38. Additionally, "[w]hether the witness was under any pressure to make a certain identification may also be significant." *People v. Enis*, 163 Ill. 2d 367, 398 (1994). "None of these factors [on their own] conclusively establishes the reliability of identification testimony; rather, the trier of fact is to take all of the factors into consideration." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 47.

¶ 95                                B. Whether a Show-up Occurred

¶ 96    Defendant argues that Carson's identification at the scene of his arrest should have been suppressed as it was the result of a suggestive *de facto* one-man show-up. The State responds that no show-up occurred, and even if it did, Carson's identification was inadvertent and made immediately after a hot pursuit of the suspect. The trial court agreed with the State, finding that Carson's viewing of defendant had been "accidental" and "spontaneous," and that "there was nothing the police did to conduct or *** institute any procedure to conduct a one-man show-up."

¶ 97    For purposes of context, current Illinois law, which became effective after the events of August 31, 2014, defines a show-up as a "procedure in which a suspected perpetrator is *presented* to the eyewitness at, or near, a crime scene for the purpose of obtaining an immediate identification." 725 ILCS 5/107A-0.1 (West 2020). (Emphasis added). Show-up identifications have been "suspiciously viewed by the courts because [they] carr[y] *** a substantial likelihood of producing a result induced by the suggestiveness of the procedure used." *People v. Murdock*, 259 Ill. App. 3d 1014, 1021 (1994); see *People v. Blumenshine*, 42 Ill. 2d 508, 512 (1969). However, "not every viewing of a suspect *** alone will be considered a denial of due process" absent "justifying or saving circumstances." *Id.* at 1022 (quoting *Blumenshine*, 42 Ill. 2d at 512). For instance, "inadvertent or accidental encounter[s]" between a witness and a suspect is an exigency that would otherwise excuse an impermissible show-up if the evidence establishes the

encounter to be "unplanned," "immediate, spontaneous, unprompted and positive." *Id.*; see *People v. Fultz*, 32 Ill. App. 3d 317, 339-40 (1975) (defendant identified by witness at the stationhouse while handcuffed and being escorted by police officers inside, but no evidence of arrangement by the police and was a "chance encounter"); see also *People v. Lutz*, 103 Ill. App. 3d 976, 982 (1982) (witness blurted out accusation following accidental encounter prior to defendant being in custody, and officer did not prompt identification).

¶ 98    We agree with the trial court that a show-up did not occur. The testimony at trial was that Kozeluh was completely unaware that Carson had followed him in the pursuit of the suspect, and that he was also unaware that Carson was near the scene of defendant's arrest when he and McRoberts began to transport defendant from the swimming pool to a squad car. There was also no evidence of any formal police procedure to elicit any identification from Carson, as Kozeluh's testimony was that Riverdale police officers were simply attempting to secure the scene and that he asked Carson to leave. We acknowledge that it was Carson's testimony that an officer had apparently asked him if "this was the guy," but Carson did not identify who the officer was. Further, Kozeluh testified that he pursued defendant based on Carson's prior descriptions, thus implicitly not requiring any sort of identification from Carson at all. Kozeluh also characterized Carson's identification of defendant as an act of "blurting out" as Kozeluh did not attempt to elicit any identification from Carson during that time. See *Murdock*, 259 Ill. App. 3d at 1022 (no impermissible show-up at stationhouse where victim's identification was immediate, "instantaneous," and "unsolicited."); *People v. Wright*, 124 Ill. App. 2d 223, 230-31 (1970) (while in waiting room of stationhouse, defendant entered the station and victim immediately identified).

¶ 99    Moreover, the trier of fact is in the best position to resolve any conflicting evidence or testimony, and here, the trial court found that any identification had been spontaneous and

inadvertent. See *People v. Brown*, 32 Ill. App. 3d 182, 186 (1975) (on her own accord, victim followed police who were questioning defendant away from the scene of the crime, and victim ultimately identified on the spot); *People v. Pardue*, 6 Ill. App. 3d 430, 432 (1972) (upholding stationhouse identification where defendant was in custody at the station, victim arrived and said "that's the man" without any police prompting); *contra People v. McKinley*, 69 Ill. 2d 145, 150, 151-53 (1977) (show-up upheld where officers told victims that they had "some people they wanted them to look at" and victims viewed potential perpetrators in an entirely separate location); *Blumenshine*, 42 Ill. 2d at 510, 513 (improper show-up where suspected perpetrator viewed standing alone in a room through a one-way mirror, and police told the victims that the suspects were in custody).

¶ 100  Because we do not find that a show-up occurred, we need not assess whether Carson's testimony was independently reliable. Accordingly, we affirm the trial court's ruling on this issue.

¶ 101                 C. Whether the Lineup Procedures Were Unduly Suggestive

¶ 102  Next, defendant contends that the lineup identifications by Carson, Short, and Johnson were unduly suggestive because the lineup employed outdated procedures, and defendant was easily distinguishable from the rest of the participants as he was dressed in a sleeveless black shirt and shorts.[11]

¶ 103  Preliminarily, we address defendant's contention that Riverdale's lineup procedures in 2014 were outdated and not in accordance with Illinois law. Defendant acknowledges that at the time of the lineup in this case, Illinois law required that fillers should not appear to be substantially

---

[11] Johnson did not testify at trial. However, there is nothing in the record to suggest that his participation in the lineup varied in any way from that of Short and Carson's. Moreover, we are mindful that "a single witness'[s] identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *Slim*, 127 Ill. 2d at 307.

different or draw attention to the suspect, lineups needed to be photographed or "otherwise recorded," and witnesses were to be admonished as to the fact that the suspect may not be present in the lineup. See 725 ILCS 5/107A-5(c), (a), (b) (eff. November 19, 2003; repealed December 31, 2014 by P.A. 98-1014) (West 2020). Nevertheless, defendant urges us to retroactively apply Illinois's amended law regarding lineup procedures to invalidate his pretrial witness identifications.

¶ 104    Section 107A-2 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107A-2 (West 2020), became effective on January 1, 2015. The amended statute sets forth standards and protocols to be utilized by law enforcement during investigations related to identifications. Relevant here, the statute provides that: an independent administrator without any knowledge of the identity of the suspect shall conduct the lineup, unless it is not practical (725 ILCS 5/107A-2(a)(1), (a)(4) (West 2020); an audio or video recording shall be made, if practical and consented to by the eyewitness (725 ILCS 5/107A-2(e)(1)(A) (West 2020); at least five fillers, in addition to the suspect, shall be included in a photo array (725 ILCS 5/107A-2(f)(3)(C) (West 2020); and the suspect must be placed in a different position in either a physical lineup or photo array for every eyewitness who provides an identification (725 ILCS 5/107A-2(f)(4)) (West 2020).

¶ 105    There is no dispute that the procedures employed by the Riverdale Police Department did not adhere to some of the procedures *now* required following the January 1, 2015 statutory enactment. Officer Kashirsky's testimony at both the suppression hearing and trial, elicited well after August 31, 2014, confirmed this, specifically as to the number of fillers in the lineup, that the lineups were not audio or video recorded, and that defendant remained in the same position throughout all three viewings. However, our court has already answered the inquiry as to whether the new law should apply retroactively to pre-2015 photo arrays and lineup procedures, and we

have answered in the negative. We see no reason to deviate. See *Corral*, 2019 IL App (1st) 171501, ¶ 96 ("Given that the statute did not govern the lineup procedures utilized in this case, it does not inform our review of defendant's challenge to the propriety of those procedures."); *Bahena*, 2019 IL App (1st) 180197, ¶ 36 (rejecting claim that a photo array with five fillers was unduly suggestive pursuant to new law requiring six because "statute did not invalidate prior photo arrays with fewer fillers"); *People v. Moore*, 2015 IL App (1st) 141451, ¶ 21 (rejecting defendants' claim that lineup was improper because it failed to include a minimum number of fillers required by new law because "the newly enacted section *** became effective on January 1, 2015, and does not govern *** lineup procedures in this case.") (overruled on other grounds, *People v. Hardman*, 2017 IL 121453).

¶ 106   We turn to the circumstances of the lineup procedures utilized here. Courts have recognized that identifications made at a lineup frequently present "the possibility of unfairness to the accused in the way a lineup is conducted." *Clifton*, 2019 IL App (1st) 151967, ¶ 60 (quoting *Foster v. California*, 394 U.S. 440, 442 (1969)). Thus, "[e]vidence of pretrial identifications of an accused by a witness must be excluded at trial only where: (1) the procedure was *unnecessarily* suggestive and (2) there was a *substantial* likelihood of misidentification." *Lawson*, 2015 IL App (1st) 120751, ¶ 39. (Emphasis added). When assessing the propriety of a pretrial lineup procedure, courts engage in a two-part analysis. *Corral*, 2019 IL App (1st) 171501, ¶ 95; *Clifton*, 2019 IL App (1st) 151967, ¶¶ 60-61. First, the defendant bears the burden of proving that "the procedure was unnecessarily suggestive and created a substantial likelihood of misidentification." *Corral*, 2019 IL App (1st) 171501, ¶ 95; see also *Clifton*, 2019 IL App (1st) 151967, ¶ 60 (defendant bears the burden of showing that the pretrial lineup was "impermissibly suggestive."). If defendant satisfies that threshold, the burden then shifts to the State to show, through "clear and convincing

evidence that the witness is identifying the defendant based on his or her independent recollection of the incident" to defeat any presumption that "the identification testimony is so tainted as to be considered unreliable." *Corral*, 2019 IL App (1st) 171501, ¶ 95; *Lawson*, 2015 IL App (1st) 120751, ¶ 39.

¶ 107    The trial court's ruling on this issue during the suppression hearing focused exclusively on the identification techniques employed by the police department, and did not find them to be improperly suggestive because: (a) Short had been placed in a separate room by herself in the police station; did not ever speak to Carson or Johnson, and signed the department's lineup and photo spread advisory forms; and (b) Kashirsky's testimony corroborated Short's in that she was isolated from the other witnesses, and that Carson and Johnson both signed advisory forms and were also separated from the others.

¶ 108    In accordance with the Illinois law in 2014, the record shows that each witness was provided with a "Line-up/Photo Spread Advisory Form." The form provided, in relevant part:

> NOTICE TO EYEWITNESS.
>
> \*\*\*     \*\*\*     \*\*\*
>
> 1.  The suspect in this case may not be in line-up or photo spread you are about to view.
>
> 2.  You are not obligated to make [an] identification.
>
> 3.  Do not assume that the Officer administering this line-up or photo spread knows which person is the suspect in this case.

Each witness initialed each statement on the advisory form and signed their names. The record further demonstrates that: (1) Carson viewed the lineup at 9:54 p.m. and made an identification at 9:55 p.m.; and (2) Short viewed the lineup at 10:01 p.m. and made an identification at 10:03 p.m.

¶ 109   We agree with the trial court that the evidence at the suppression hearing and trial was consistent that witnesses were kept separate from one another and did not interact with one another at the police station, and that the techniques employed with respect to the handling of the witnesses were proper. See *People v. Coleman*, 203 Ill. App. 3d 83, 92-93 (1990) (affirming denial of motion to suppress where witnesses viewed lineup separately and did not meet or talk with one another); *Lawson*, 2015 IL App (1st) 120751, ¶ 41 (affirming denial of motion to suppress where witnesses signed lineup advisory forms, viewed separately, and waited in separate areas). That said, we note that nothing in the trial court's ruling addressed the issue of defendant's appearance compared to the other fillers in the lineup and photo arrays. The only mention of the suspect's description in relation to Carson and Short's testimony arose when the court acknowledged that although the original witness descriptions had included a hat, a hat had never been recovered in the investigation.

¶ 110   Although compliance with lineup identification protocols is, by design, intended to avoid unfairness, it does not necessarily follow that in every case, such compliance will serve its intended purpose. For that reason, we look beyond the protocols, to determine whether other factors might have rendered the lineup procedure in this case "unnecessarily" suggestive, such that there was a "substantial likelihood of misidentification." See *People v. Johnson*, 149 Ill. 2d 118, 147 (1992) (court must look to the totality of the circumstances surrounding the identification to determine whether due process is violated).

¶ 111    "[W]here the challenged identification procedure is a photo array or lineup, individuals selected for the array or lineup need not be physically identical." *Corral*, 2019 IL App (1st) 171501, ¶ 95. One distinct feature may not be sufficient to render a lineup suggestive when the other participants have substantially similar appearances. *Clifton*, 2019 IL App (1st) 151967, ¶ 69. The record here shows that in terms of physical characteristics, such as race, skin tone, height, and weight, all five individuals appear to be similarly situated. All five individuals, including defendant, are seated, appear to be of similar height and weight, are black males, have varying degrees of baldness, and at least four appear to have some type of facial hair.  Thus, we perceive no issue with respect to the fillers' physical appearances.

¶ 112    However, defendant appears to be the only individual who closely fit the description of clothing provided by Short and Carson. His attire appears strikingly distinctive from the rest of the fillers. In position number four, defendant is pictured wearing a black tank top and light-colored bottoms that appear to be shorts. In contrast, filler number one is wearing a bright royal blue short-sleeved shirt with thin white stripes and what appear to be blue jean bottoms; filler number two is wearing a black long-sleeved hooded sweatshirt with multi-colored bottoms; filler number three is wearing a gray, black and white mid-sleeved shirt with black pants; and filler number five is wearing a long-sleeved black shirt with blue bottoms. No other filler is wearing shorts, and no filler is wearing a top that could be described as a black T-shirt.

¶ 113    Clearly, there is a disparity in the other lineup participants' attire when compared to defendant. Even so, a disparity in attire does not render a lineup identification unnecessarily suggestive. *People v. Johnson*, 149 Ill. 2d 118 (1992), is instructive. In *Johnson*, the defendant asserted that the lineup identification in his case was suggestive where, like him, only one other individual in the lineup wore a leather coat. *Id.* at 146-48. In rejecting defendant's claim of

suggestiveness, our supreme court noted that there was no indication that the one other individual wearing a leather coat was by design. *Id*. at 147-48. The court reasoned that "had the perpetrator been ordered to wear an orange coat when all the others in the lineup were made to wear brown coats, or some other such activity which might single him out," the court might have otherwise suspected suggestive activity. *Id.* at 148. However, the defendant was simply wearing his own clothing. *Id*. Further, the witnesses identified defendant by his face at trial. *Id.*

¶ 114   Here, it was Kashirsky's testimony that he attempted to find fillers in a short period of time. Like in *Johnson*, defendant here simply wore his own clothing during the lineup. There is nothing in the record, and defendant cannot indicate any activity on the part of law enforcement that would, by design, single defendant out in the lineup. Moreover, it was Short's testimony that she identified defendant based on his facial features, not his clothing. Additionally, both Short and Carson identified defendant by face at trial.

¶ 115   Further, our courts have upheld lineup procedures even when a suspect wears a different color shirt or sleeve length compared to the fillers in the lineup. See *People v. Faber*, 2012 IL App (1st) 093273, ¶ 57 (upholding lineup procedure where defendant wore a white T-shirt and two other fillers wore colored shirts and stating that the fact that defendant was the only one wearing a sleeveless T-shirt was not sufficient to render lineup suggestive); *People v. Johnson*, 222 Ill. App. 3d 1, 7-8 (1991) (upholding lineup procedure even though suspect was the only one wearing red pants as described by prior identification).

¶ 116   Defendant contends that the lineup procedures in *People v. Clifton*, 2019 IL App (1st) 151967, and *People v. Maloney*, 201 Ill. App. 3d 599 (1990), were just as suggestive as the lineup in this case, as defendant  "stood out" from other fillers based on his physical appearance and his

clothing matched the witnesses' description of the suspect's clothing. Thus, he argues that, as in *Clifton* and *Maloney*, reversal is required.

¶ 117    We find both *Clifton* and *Maloney* distinguishable. In *Clifton,* a divided panel of this court found a lineup, conducted two days after the initial crime, to be unduly suggestive. 2019 IL App (1st) 151967, ¶¶ 12, 62. There, the defendant was initially described by a witness as wearing white gym shorts, jogging pants, a dark blue or black hooded sweatshirt, and in particular, a scar or tattoo on his face. *Id*. ¶¶ 8, 10, 14-16. The fillers in the lineup had varying hairstyles, and at least three other fillers wore a different color shirt, and different colored pants. *Id*. ¶ 62. None of the fillers had any sort of mark or distinguishing facial feature on their face. *Id.* ¶ 14, 16, 17.

¶ 118    In reversing, we found persuasive that the defendant appeared to fit the complete profile of the witnesses' description, including the presence of a noticeable facial tattoo. *Id*. ¶¶ 62, 69. We also noted the amount of time that elapsed between the initial crime and the lineup, two days, which provided the police department with a significantly greater amount of time to properly execute its lineup. *Id*. ¶ 78. In *Maloney*, an even greater amount of time elapsed, about five days. 201 Ill. App. 3d at 602, 605. Additionally, the defendant's "unkempt and disheveled appearance" compared to the "well, if casually dressed and groomed" lineup participants, highlighted "extreme" differences that drew "attention to defendant." *Id.* at 607.

¶ 119    Here, we do not find the circumstances of the lineup procedure to present similar concerns for suggestiveness. The lineup was conducted on the same day of the armed robbery, which required only a few hours for the police department to conduct a viewing. The evidence showed that Kashirsky attempted to find fillers who fit the physical description of the suspect within a short time span, and although defendant attempts to draw much attention to how he appeared in the lineup, the fillers appear to be of similar height and weight, with similar complexions and

hairstyles. Further, defendant bore no distinguishing features such as the tattoo in *Clifton,* or an unkempt appearance as in *Maloney.* Although both Carson and Short described the suspect as wearing a hat, no filler wore one in the lineup. Finally, we give much weight to Short's credible testimony that, in the short amount of time between the crime and the lineup, she was able to identify defendant based on his facial features, not his clothing. On this record, we cannot find that the lineup was unnecessarily suggestive or that there was a substantial likelihood of misidentification.

¶ 120    Although the trial court found that the lineup procedures were not suggestive, it nevertheless evaluated the eyewitness testimony at trial pursuant to the *Biggers* factors, the second part of the test typically applied after a defendant meets its burden in demonstrating a suggestive identification. Having determined that the lineup was not unduly suggestive, we need not consider whether the identification was independently reliable. See *Johnson*, 222 Ill. App. 3d at 8-9 (where there is a finding that the lineup is not suggestive, the court need not "reach the question of whether under the totality of the circumstances [that] the identification was reliable[.]"). Nevertheless, we find, as did the trial court, that the eyewitness testimony was sufficiently developed and independently reliable to sustain defendant's convictions. See *Clifton*, 2019 IL App (1st) 151967, ¶¶ 108-09 (Lavin, J., concurring in part, dissenting in part) (even if lineup was unduly suggestive, the record was sufficiently developed as to the independent reliability of witnesses to sustain trial court's findings).

¶ 121    Briefly, as to the first *Biggers* factor, the opportunity the victim had to view the criminal at the time of the crime, the events took place in broad daylight, and there was no indication that defendant's face was ever obscured. See *Faber*, 2012 IL App (1st) 093273, ¶ 58 (crime occurred in daylight); *Lawson*, 2015 IL App (1st) 120751, ¶ 41 (defendant's face never concealed during

twenty-five-minute robbery when victims were less than five feet away). Further, both Short and Carson testified to seeing defendant prior to the robbery. During the robbery, defendant was reaching into the car towards both witnesses, and was positioned right in front of them or within close distance, thus giving them a full view of his face. See *People v. Blankenship,* 2019 IL App (1st) 171494, ¶ 28 (two-to-three-minute viewing of defendant sufficient when his face was uncovered, and witness was less than three feet away). Further, after robbing Johnson, defendant returned to Short's vehicle, providing an additional opportunity for the witnesses to observe him. Carson also saw defendant during the car chase, and he provided multiple identifications during the pursuit of defendant as the man who robbed and shot at him.

¶ 122    Second, as to the witness's degree of attention, although Short and Carson's testimony was that they were scared and aware of the gun at the time of the robbery, Short's testimony was that she had noticed defendant even prior to the robbery and was able to identify him based on his face. See *Blankenship*, 2019 IL App (1st) 171494, ¶ 29 (presence of a weapon did not deter witness providing detailed account of robbery and physical description of defendant). Further, Carson's pursuit of defendant suggests a high level of attention on him even if, as noted by the trial court, he may not have exercised his best judgment in following him. See *Corral*, 2019 IL App (1st) 171501, ¶ 78 (even if witness attention had shifted briefly, witness could sufficiently testify to defendant's demeanor and mannerisms).

¶ 123    Third, as to the accuracy of the witness's prior description of the criminal, the trial court found that both Short and Carson's identifications, "although [not] on point, exact, it was very close." We agree. Although both initial identifications had included defendant wearing a hat, Carson and Short consistently described defendant wearing a black top and light-colored shorts. They also described him as balding, even though they were unable to view whether he had any

hair due to him allegedly wearing a hat. See *Corral*, 2019 IL App (1st) 171501, ¶ 85 (minor inconsistencies between witness testimony may affect weight of evidence but does not automatically create reasonable doubt). Their descriptions of defendant were ultimately in line with the individual they selected in the lineup. Although defendant was not wearing a black T-shirt, he was wearing a black top and light-colored shorts, and appeared to be balding.

¶ 124 Fourth, as to the level of certainty demonstrated by the victim at the identification confrontation, as to Short, the trial court said that she "exhibited a high degree of certainty *** during the initial confrontation [and] at the lineup, both occurring on the same day." We agree. Carson identified defendant multiple times during the commission of the crime, including when defendant was being taken in custody, and both Carson and Short identified him within a minute or so during the lineup conducted the same day of the robbery. See *Lawson*, 2015 IL App (1st) 120751, ¶ 41 (identification made within less than a minute).

¶ 125 Fifth, as to the length of time between the crime and the identification confrontation, all identifications were made within the same day, indeed a mere few hours after the crime. We have upheld identifications well past a few hours' time. See *Lawson*, 2015 IL App (1st) 120751, ¶ 41 (identification made twelve hours after crime); *Corral*, 2019 IL App (1st) 171501, ¶ 81 (identifications made forty-eight and sixty-two days after crime); *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (identification made after one year, four months).

¶ 126 In sum, we conclude that Short and Carson viewed defendant under circumstances permitting a positive identification, and thus their testimony was independently reliable to sustain defendant's convictions.

¶ 127   Ultimately, we find no error in the trial court's denial of the motion to suppress. Further, the evidence at trial was sufficient to establish defendant's guilt beyond a reasonable doubt. Accordingly, we affirm the trial court's judgment in its entirety.

¶ 128                               III. CONCLUSION

¶ 129   For the reasons stated, we affirm the judgment of the circuit court.

¶ 130   Affirmed.